# FIDELITY MUTUAL LIFE ASSOCIATION v. METTLER.

ERROR TO·THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF TEXAS.

No. 165.  Argued January 31, 1902.—Decided May 5, 1902.

The classification of life and health insurance companies separately from
fire, marine and inland insurance companies, and mutual benefit and re-
lief organizations doing business through lodges and mutual benefit as-
sociations, made by the State of Texas in respect of insurance, is not so
arbitrary and destitute of reasonable basis as to be obnoxious to constitu-
tional objection.

In an action on a life insurance policy it is not necessary to prove the fact
of death beyond a reasonable doubt.  A verdict for the party in whose
favor the weight of evidence preponderates will be sustained.

The inference of death may arise from disappearance under circumstances
inconsistent with a continuation of life.

The belief of the family of an assured that he is dead is not admissible on
the trial of an action on a policy of insurance on his life as independent
evidence of the fact of his death, but the entertainment of such belief
may be proven as tending to show innocence of fraud.  And, in this case,
the evidence which was admitted cannot be presumed, the entire record
considered, to have had any influence whatever on the verdict except from·
the point of view in which it was admissible.

No other objection urged constituted reversible error or requires particular
mention.

THIS was an action brought by Jennie M. Mettler in the Dis-
trict Court of Dallas County, Texas,. December 2, 1897, and re-
moved to the Circuit Court of the United States for the Northern
District of Texas, against the Fidelity Mutual Life Insurance
Association of Philadelphia, to recover on three policies of in-
surance upon the life of one William A. Hunter, payable to his
widowed sister, Jennie M. Mettler, each stipulating for the pay-
ment of $5000 in case of Hunter's death.  The policies were
dated in October, 1896, and Hunter paid at the time of their
delivery the sum of $32.55 on each policy, and agreed to pay on
each a like sum semi-annually thereafter, on the 28th day of the

months of April and October, for the period of ten years from October 28, 1896.

At the commencement of the trial "defendant admitted that all matters of proof relating to the death of the insured, all formal proofs, are sufficient, and that the only question to be tried and involved is the question of whether or not W. A. Hunter is dead as claimed in plaintiff's petition, and whether he died in the manner and form as alleged therein."

The evidence tended to show that Hunter left Mrs. Mettler's house on the third of December, 1896, announcing his intention to go to Mentone, in Loving County, for the purpose of making proof of a section of land in that county belonging to him, and which he had occupied for three years; that he left with a team consisting of a wagon and two horses, with hay, provisions, camping outfit, cooking utensils, and a gun; and that he expected to be absent a week or ten days, intending, at a later period, after having returned from Mentone, to go back to that place; that shortly before leaving he handed to a lawyer a package of papers sealed in a large envelope, which he asked should be kept in a vault, and which packages contained the policies of insurance; and that Mrs. Mettler did not know that the policies had been taken out in her name.

The evidence further tended to show that Mrs. Mettler, not hearing anything of her brother for fifteen days after his departure, sent twice to ascertain whether he had arrived, but found that he had not; a searching party then went out; this party followed the trail of the wagon, and found it and hay, provisions, harnesses, etc., abandoned where Hunter had camped near the banks of the Pecos River, some miles distant from Pecos; a bed on the ground, which some one had slept in, cooking utensils, remains of a fire, a skillet in which meat had been fried, some bread, some tomatoes were there; and a gun was leaning against the wagon wheel. One of the horses was lying dead; it had been tied to a mesquite bush with an inch rope, and had struggled to get to the hay, but could not reach it; there were signs of the other horse, which was elsewhere seen wandering about with a rope on its neck. Footprints, identified by Mrs. Mettler as those of her brother, were found lead-

ing to the river, but not returning; two water buckets were near; some of the foot tracks were at the edge of the river; and there were marks of the slipping of one of the feet, and a broken mesquite root in the bank.[1]

---

[1] The county clerk of Reeves County, who headed the searching party which left Pecos on the morning of December 27, testified in respect of the abandoned camp thus: "The wagon was standing with the tongue pointing to the southwest and a little down the river. The harness for two horses was found; two wooden water buckets, with a piece of rope tied in the bail; off to the right of the wagon, about twelve feet from the wagon, was a dead horse, tied to a mesquite bush with a rope about twelve feet long. On the right side of the wagon was a pallet made down. The spring seat had been taken off the wagon and turned upside down, and the wagon sheet laid lengthwise. The sheet was a tarpaulin; this was laid on the ground and spread out full length, with one end resting on the wagon seat. One or two heavy cotton comforts were doubled lengthwise and lay with the end on the wagon seat. Lengthwise of the wagon sheet and on top were two comforts spread out full size, and the wagon sheet had been drawn up over the entire bed. To the left of that, about four feet south and away from the edge, was where there had been a little fire, and there was a skillet and lid. The skillet was setting right where the fire had been built, as if in the middle of the fire, and the lid laying against it. The skillet looked like it had been cooked in. Just behind the front wheel of the wagon, leaning against the axle, was a Winchester rifle. In the wagon were two bales of alfalfa hay and some flour, some canned goods, some light bread, and several joints of stove pipe, and I think, may be, a stove in the wagon and a few other such things. The bread had been untied, and there was still some of it in the paper. When I first saw the bed the centre of the bed had the shape of a man in it; looked so much like it we thought there was a man in it until we got right up, and when George Mansfield started to raise the cover up he dropped it, and turned and looked at me, his face as white as anything could be, and I told him to raise it up; that if there was a man in it, it would not hurt him, and he raised the cover up. The appearance of the bed was as I have described it; there was just the shape of a man there, as if a man had lay in bed; the print of him was in bed. I think both buckets had a piece of rope tied in the bail ten or twelve feet long, and on the bottom two or three inches around; the buckets had the prints of water having been in there and dried up, and a little red sand; they were both dry. The dead horse could not reach the wagon; it had been tied to a mesquite bush with an inch rope, and it appeared that the horse had been struggling to get to the hay in the wagon; he had gone out as far as he could with the rope; there was considerable trail beat around where he was trying to get to the wagon where the hay was. The trail was two or three inches deep. There had been other stock about the wagon and camp; there was the sign of another horse there, and we trailed that

Statement of the Case.

There was conflicting evidence as to quicksands in the river; its depth; rapidity; and dangerous character. Two of defendant's witnesses gave testimony tending to show that some time after the alleged death they had seen a person whom they identified as Hunter by photographs.

In the course of the examination of plaintiff the following occurred:

"'Q. State what is the general reputation in the family— your father, brothers, and sisters—as to the death of your brother, W. A. Hunter.' To which defendant objected because it is incompetent and hearsay; (2) family reputation cannot establish or prove death, especially where it is 1500 miles away; (3) it is competent for no purpose, especially when that reputation has been established since the institution of this cause of action, which objection the court overruled and said: 'I think the question is one of weight to be given the evidence. It is a question for the jury to say whether or not family belief tends to prove his death.' To which ruling, defendant then and there excepted for the reasons stated in the objection, and the witness thereupon testified: 'My father, brothers, and sisters all believe

---

horse away from the wagon and back to the wagon at about a half a dozen places. I think one bale of hay had been eaten and tramped down; there was a great deal of trash on the back end of the wagon and laying on the ground."

The witness then described the tracing of the tracks of a man "to the edge of the river and back to the wagon;" then later other footprints "going toward the bank of the river at a point higher up." "We followed right up to the edge of the bank and followed that until they went over a little slant; the top of the river bank was a little sloping; these two footprints, last two, were standing right on that slant, left foot a little behind the right. The footprints had been about half facing the river. The left foot seemed to have turned a little and slipped; the print of it was there, and showed that it had slipped; and just in front and just below where this bank dropped off perpendicular there was a mesquite root that had been broken off and a part of it was sticking out of the ground. We could see none of these tracks were going back and away from the river; we looked to determine whether they did go away from it and we could not see any going away from there."

Mrs. Mettler, being informed of the discovery, went to the camp with this witness, December 29, and she identified the footprints and testified to the same effect.

my brother to be dead.' Witness further testified, over the same objections made by defendant, which objections were over-ruled by the court, and then and there excepted to by defend-ant, 'that the family believed he was drowned in the Pecos River, out in the West, and that this family belief has' existed ever since I wrote them about it.' The witness was here handed a letter, which she recognized as written by herself and ad-dressed to her father, dated December 30, 1896. ' I think I wrote it the day I came back from the camp, from where we found my brother's camping outfit.' ' I reported that my brother was dead. I know he wrote to and received some let-ters from the family. The very best relations existed between my father and brother. Never was any disagreement be-tween them. The very closest of friendship existed between my brother and me; brotherly and sisterly love.' "

Plaintiff introduced the depositions of W. A. Hunter, Sr., the father of the insured ; Charles E. Hunter, his brother ; and five sisters, all residing in Homer, Ohio. The father tes-tified that plaintiff and W. A. Hunter, Jr., lived at Homer until they went to Texas in 1885 ; that a family correspondence had been kept up with both of them regularly until the fall of 1896, when he disappeared, and was still kept up with her ; that the family relationship was happy and affectionate; that his son's habits were good, and that he possessed the confidence of his family and of his friends ; that he " seemed thoroughly con-tented with life, and I know of no reason to cause any change in his disposition. I could not tell exactly when any member of the family at Homer last received a letter from said William A. Hunter, Jr., but a short time before his disappearance. 'I last heard of him through Jennie M. Mettler, about the time he disappeared, and he was living at Mentone, Texas, I be-lieve."

The following question was propounded to the witness, W. A. Hunter, Sr., and to the other members of the family :

" Q. If you know, state what is the general reputation and repute in the family as to whether said William A. Hunter is dead or alive ? How do you know the general repute in the family as to whether he is dead or alive ? If you know, what

is the general repute in the family as to what has become of said William A. Hunter? As to the 'family,' who do you mean?"

To this question and the answer thereto of each witness, defendant then and there objected, which was overruled, and defendant excepted. The answer was:

" A. That the general repute in the family is that William A. Hunter, Jr., is dead. He is supposed by the family to have drowned in the Pecos River; that is the general belief. By the 'family' is meant the father and the brothers and sisters of William A. Hunter, Jr."

Each of the other witnesses testified in substance as their father, and the same objection was made to their testimony, and the same ruling had and exception preserved. The father testified " in answer to cross interrogatories propounded by defendant, that he never offered any reward or took any steps to find W. A. Hunter, Jr., either dead or alive, after he heard of his disappearance; that he made no inquiry concerning the said W. A. Hunter, Jr., save through his daughter, Mrs. Mettler; that he did not have the Pecos River seined, and made no search either of the river or elsewhere, or any effort to find him or his body. Newark, Licking County, Ohio, is sixteen miles from witness's home. When witness saw the articles published in the Newark Advocate about the disappearance of W. A. Hunter, Jr., he did not go there to see the editor of said paper. The town is not connected by rail with witness's residence. The same facts as to failure to offer reward or to make any search or inquiry for W. A. Hunter, Jr., were elicited by cross interrogatories from Charles E. Hunter, brother of the plaintiff and W. A. Hunter, Jr."

The jury was charged, among other things: " Reputation in his (insured's) family on the part of his father, sisters and brothers of his death is proper evidence for your consideration, but not the opinion of any one."

The policies were stated to be made in consideration of written application of Hunter therefor, and a copy of the application was attached. Hunter therein agreed " that the truthfulness of the statements above made or contained, by whomsoever

written, is material to the risk, and is the sole basis of the contract with the said association;" "that I will not without the written consent of the president engage in any occupation or employment more hazardous than that above mentioned; and that if any concealment, or untrue statement, or answer be made or contained herein, then the policy of insurance issued hereon and this contract shall be *ipso facto* null and void, and all moneys paid hereon shall be forfeited to said association." And the applications showed, among other things, that Hunter in answering questions as to his occupation said: "That my present occupation is real estate and farming, prior was bookkeeping."

There was evidence that Hunter had occupied a section of land in Loving County for three years; that he was in the real estate and farming business; that he planted corn, grain, potatoes, and so on; that the farming was experimental, the land requiring irrigation; that he and Mr. Mettler, then deceased, had been connected with an irrigation company and the construction of a ditch; and that he resided at Mentone, Loving County, "where he engaged in the real estate and farming business, and looked after their irrigation business in Loving County." That he was bookkeeping in 1888 and 1889, and two years, deputy clerk, etc. Defendant introduced evidence in reference to forfeitures of Hunter's claims to public lands entered in February, 1897; and the testimony of a photographer that Hunter was in his employ two or three months one summer at Fort Worth, which he thought was in 1896. Defendant's agent who took the application testified that he had known Hunter since 1888, at which time he was keeping books; that Hunter stated when he applied that he was in the real estate business and farming, and that witness had a talk with him about irrigation matters in connection with his farming.

This witness testified for defendant that when Hunter made the application he said: "That he and his brother-in-law had gotten into an irrigation scheme and had bought a good deal of Pecos Valley land and owed a good deal of money on the land, and his brother-in-law had afterwards died, and he thought, if he should happen to die, his sister would lose what they had

paid. For this reason he thought of taking some insurance, so that she could pay the land out in the event of his death."

The constitutionality of the statute of Texas allowing twelve per cent damages and reasonable attorneys' fees was denied and duly put in issue by defendant.

The verdict was for plaintiff for "$15,000 as principal; $2250 as interest at rate six per cent from December 2d, 1897, to June 2d, 1900; $5175, the same being twelve per cent damages on the amount of $15,000 and interest thereon at six per cent; $2500 as reasonable attorney's fees." Plaintiff remitted the sum of $3375 of said $5175, "leaving $1800 on the item of twelve per cent damages, on the amount of the loss," and judgment was thereupon entered:

The writ of error was allowed directly from this court, and a motion to dismiss for want of jurisdiction was made, the consideration of which was postponed to the merits.

*Mr. John G. Johnson* for plaintiff in error.

*Mr. C. A. Culberson* for defendant in error.

Mr. CHIEF JUSTICE FULLER delivered the opinion of the court.

Inasmuch as the validity of the statute of Texas authorizing the recovery of damages and attorneys' fees for failure by life and health insurance companies to pay losses was seasonably drawn in question by defendant below as being in contravention of the Constitution of the United States, we think the case comes within *Loeb* v. *Columbia Township Trustees*, 179 U. S. 472; *American Sugar Refining Company* v. *New Orleans*, 181 U. S. 277, and that the writ of error may be maintained. The motion to dismiss is, therefore, overruled.

Four propositions are relied on as grounds of reversal, which we will consider in the reverse order in which they are stated in the brief for plaintiff in error.

I. "The court erred in not charging the jury to find a verdict in favor of the defendant because of the failure to offer sufficient evidence from which an inference of Hunter's death could be drawn."

In our opinion the evidence was sufficient to justify the inference that Hunter was drowned in the Pecos River, on December 4, 1896, and the court below properly refused to peremptorily instruct the jury to find for defendant.

The question of Hunter's death was a question of fact to be determined on all relevant facts and circumstances disclosed by the evidence. The evidence tended to show that he was last seen alive on December 3d, when he parted from his sister and started for Mentone, with the intention of returning in a few days. He did not arrive, nor return, but disappeared. He camped on the banks of the Pecos River; and the abandoned wagon, harnesses and gun, the starved horse, the ashes of the fire, the used cooking utensils, the fragments of food, the bed with its imprint of the sleeper, bore testimony that he cooked, ate, and slept there, and that he went no farther. The footsteps to the river's brink, going but not returning, the water buckets, the mark of slipping, the fractured root, the flowing stream, indicated what might have happened, and the fact that he was not seen nor heard from thereafter, although his relations with his family were intimate and cordial, and he had always kept up a correspondence with them, so that one or more of them would have been likely to hear from him unless his life had abruptly terminated or its habitual course been suddenly changed, rendered the inference of fatal accident reasonable.

The record does not set forth the general charge of the court in full, but, among others, this instruction was given: "While death may be presumed from the absence, for seven years, of one not heard from, where news from him, if living, would probably have been had, yet this period of seven years during which the presumption of continued life runs, and at the end of which it is presumed that life ceases, may be shortened by proof of such facts and circumstances connected with the disappearance of the person whose life is the subject of inquiry, and circumstances connected with his habits and customs of life, as, submitted to the test of reason and experience, would show to your satisfaction by a preponderance of the evidence that the person was dead."

Defendant excepted to the giving of this instruction, and

requested the court to instruct that " the circumstances proven must exclude, to a reasonable and moral certainty, the fact that such person is still living, and each fact in the chain of facts from which the death of the party is to be inferred must be proved by competent evidence and by the same weight and force of evidence as if each one were the main fact in issue, and all the facts proven must be consistent with each other and consistent with the main facts in issue, that is, the death of the party."

The court did not err in giving the one and refusing the other instruction. This was not a criminal case, and it was not necessary that the death should be proven beyond a reasonable doubt. The party on whose side the weight of evidence preponderated was entitled to the verdict. Proof to a " moral certainty " is an equivalent phrase with " beyond a reasonable doubt." Gray, C. J., *Commonwealth* v. *Costley*, 118 Mass. 1. In civil cases it is sufficient if the evidence on the whole agrees with and supports the hypothesis that it is adduced to prove, but in criminal cases it must exclude every other hypothesis but that of the guilt of the party. It has been held in some cases that when a criminal act is alleged the rule of reasonable doubt is applicable in establishing that act, but this is not such a case. 1 Greenleaf, Ev. (15th ed.) § 13a, note.

The court also instructed the jury as follows: " If from the evidence in this case you should come to the conclusion that Hunter has been continuously absent since December 3, 1896, without being heard from by his relatives and friends, it should have due weight with you in arriving at your verdict." " Absence alone cannot establish the death of Hunter, for the law presumes an individual shown to be alive and in health at the time of his disappearance continues to live. While the death of Hunter is not to be presumed from absence alone, yet it is a circumstance which should be taken into consideration with all the other evidence in the case, and the conclusion of life or death arrived at from all the facts and circumstances, including his continued absence."

To this defendant excepted, and it is now argued that there was error because the court did not call the attention of the

jury to defendant's contention that Hunter's continued absence might be attributed to the desire to obtain the insurance money. But it nowhere appears that defendant requested the court to modify the instruction in that particular, and as given it was correct.

The jury were not left to infer death from the mere fact of disappearance, but were specifically told that that was not in itself sufficient, and that all the facts and circumstances must be considered.

Defendant asked the court to give this instruction : "If you believe from the evidence that William A. Hunter, Jr., has been seen or heard from by any one at any time since his disappearance, you will find for the defendant." This the court refused, and gave the following instruction : "The evidence of witnesses is also before you tending to show that William A. Hunter has been seen on two occasions and at two places since the date of his alleged disappearance on December 4, 1896. You should carefully consider this evidence in relation to his having been seen since the date of his alleged disappearance, and if you believe from the evidence that he was seen by the witnesses who have testified to this, then, of course, it would be your duty to find for the defendant."

There was some evidence that Hunter had been seen, but none that he had been otherwise heard from. The request of defendant was rightly rejected, and the instruction given was sufficient. The criticism that the jury may have supposed that they were instructed that they must be satisfied that he had been seen by both witnesses, or on two occasions, is without merit. It was impossible to have misunderstood what the learned judge of the Circuit Court intended. If, as matter of fact, Hunter was seen alive, whether once or twice, then, of course he did not die as contended by plaintiff.

It is further argued that the court erred in not instructing the jury as requested by defendant, that "unless the jury believe from the evidence that William A. Hunter, Jr., when last seen was in a position of peril, such as that it is more probable that he then and there lost his life than that he extricated himself from such perilous position alive, you must find for the defendant."

Such an instruction was uncalled for and calculated to mislead. There was no evidence that Hunter was in a position of peril when last seen.   The evidence did, indeed, tend to show that he probably fell into the river, and so came in contact with a specific peril, and there was evidence regarding the depth, the rapidity and the quicksands of the river; but the instruction was objectionable in that it assumed that he.was seen in a perilous position of such a character as to afford the basis for speculation as to the probabilities of his extrication.

In *Davie* v. *Briggs*, 97 U. S. 628, 634, Mr. Justice Harlan said : " If it appears in evidence that the absent person, within the seven years, encountered some specific peril, or within that period came within the range of some impending or immediate danger, which might reasonably be expected to destroy life, the court or jury may infer that life ceased before the expiration of the seven years."

But it was not thereby ruled that the inference of death might not arise from disappearance under circumstances inconsistent with a continuation of life, even though exposure to some particular peril was not shown, and the evidence indicated that Hunter came within the range of immediate danger.

II. "The court erred in not charging, as requested, that if Hunter at the time of making application for insurance was not a farmer and real estate agent, there could be no recovery."

This relates to the refusal to instruct that " the jury must believe from the evidence that W. A. Hunter, Jr., at the time of making application for insurance to defendant, on which policies of insurance were issued and are herein involved, was at the time he made such application both a farmer and real estate agent, and unless you so believe, you will find for the defendant."

The entire charge of the court is not in the record, and there is nothing to show that the subject of Hunter's answer as to his occupation was not covered by it.   Again, Hunter did not say that he was " a farmer and real estate agent," but that his occupation when he made the application was " real estate and farming," and the evidence of the truthfulness of that statement was so plenary, and the evidence from which to infer the contrary

was so slight, that we think the refusal was justified on that ground.

Treating the statement of occupation as a warranty, the evidence that Hunter was behind in his payments on the land in Loving County, and that forfeitures were entered in February, 1897, and that he may have been engaged with a photographer for two or three months, even in the summer of 1896, did not so impugn the substantial truth and good faith of his answer as to demand an instruction so worded.

III. "The court erred in admitting the testimony of a repute in the family of Hunter, concerning his death, and the manner thereof."

Hunter had parted with his sister and started for Mentone, December 3, with the intention of returning within a week or ten days. "After he had been gone ten days and did not come back and then two weeks and did not come back," his sister sent a man to make inquiry, who reported that Hunter had not been to Mentone. A few days later she sent again, and received a similar reply. The searching party went out, found the abandoned camp, and reported, and Mrs. Mettler then went herself. She described the condition of things at the camp and the brink of the river. This was December 29, and December 30, the day after she returned, she wrote her father in Ohio about it and that her brother was dead, drowned in the Pecos River, and she testified that her father, brothers and sisters, all believed that this was so, because of what she had written; while they testified that this was the belief of the family, based on the information she furnished. If this testimony should not have been admitted it is difficult to see that it could have been so prejudicial as to be fatal to the verdict, for it amounted to nothing more than the assertion of Mrs. Mettler's belief and the acceptance by the family of that belief as their own. In other words, it cannot be supposed that the jury regarded the evidence as tending to establish the fact of death when it purported only to state Mrs. Mettler's belief and the family's concurrence.

Moreover, in the aspect of showing the entertainment of such belief in good faith the evidence was admissible, if it had been

offered at the proper time. Hunter had suddenly disappeared. Search was made, but was not prosecuted after the discovery of the deserted camp. The father was sharply interrogated as to failure to offer reward, to seine the river, to make "effort to find him, or his body." And so was the brother Charles. The theory of the insurance company was that the disappearance was voluntary, and that the conduct of Mrs. Mettler and the family was consistent with the belief that he was yet alive, and was indicative of a combination to defraud the company. This inference the family were entitled to repel by testifying to their conviction of his death. As to the fact of death, it was mere matter of opinion, but as to their belief it was matter of fact showing innocence of fraud. Reasonable inquiry is frequently a prerequisite to the inference of death from disappearance, as well as other effort, but no inquiry or effort was made here after discovery of the camp, because the belief of death and lapse of time rendered it useless. Whether that belief was well founded was for the jury, but that there was such belief was a relevant fact. *New York Life Insurance Company* v. *Hillmon,* 145 U. S. 285, 296; *Wallace* v. *United States,* 162 U. S. 477.

But we do not think the evidence was competent to establish the fact of death, under the circumstances of the case. To illustrate: In *Scott* v. *Ratliffe,* 5 Pet. 81, it was held that the testimony of a witness that "she was told that Mr. Madison was dead," was admissible; and in *Secrist* v. *Green,* 3 Wall. 744, 751, it was said that "it is competent to prove death and heirship by reputation." But these and similar rulings and expressions in other cases must be taken in connection with the particular facts and circumstances. In this case no question of pedigree; of birth, marriage, or death as bearing on legitimacy, descent, or relationship; of ancient rights; of past events prior to controversy, was involved; nor was there any pretence that this was evidence of tradition, or historical fact, or general reputation in the community participated in by the family. If evidence of death it would be evidence of the particular fact on which recovery was sought, and inadmissible as such. The ruling was incorrect that: "It is a question for the jury to say

whether or not family belief tends to prove his death," although that was qualified .by the learned judge charging the jury: "Reputation in his (insured's) family on the part of his father, sisters, and brothers of his death is proper evidence for your consideration, but not the opinion of any one." But, the entire record considered, we are of opinion that it cannot be presumed that the evidence affected the verdict injuriously to defendant, if at all, and, on the contrary, that it affirmatively appears that if it could have had any influence whatever, it was solely from the point of view, which rendered it admissible.

IV. "The statute of Texas, which directs that life and health insurance companies, who shall default in payment of their policies, shall pay twelve per cent damages, together with reasonable attorney's fees, is in violation of the Constitution of the United States."

The statute referred to is article 3071 of the Revised Statutes of Texas of 1895, which reads as follows: "In all cases where a loss occurs and the life or health insurance company liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent damages on the amount of such loss, together with all reasonable attorney's fees for the prosecution and collection of such loss."

Article 3072 provided that if any life or health insurance company failed to pay off and satisfy any execution issued on final judgment against it within thirty days of demand of payment, the commissioner of insurance should declare the company's certificate of authority to do business null and void.

These articles were sections of chapter three of Title LVIII, "Insurance," and had been brought forward from the Revised Statutes of 1879, arts. 2953, 2954, chapter three, Title LIII, "Insurance." And the same provisions as to foreign life insurance companies and those incorporated outside of the State of Texas were contained in the first general insurance statute of Texas, which was passed on May 2, 1874. 2 Paschal's Dig. art. 7116 o.

Under this title no insurance company was permitted to do

business in Texas without first obtaining a permit from the commissioner of insurance, and compliance with the law was required before permission could be granted, while by the terms of article 3060 the commissioner was required to revoke the certificate of authority to do business in the State in case any company failed for thirty days to pay any execution issued against it on any valid judgment.

The provisions of chapter three embodied many conditions on which business was permitted to be done. By article 3061 it was made unlawful for any person to act within the State as agent or otherwise for any insurance company for soliciting business unless the company had procured authority to do it from the commissioner. Article 3062 provided that any life or health insurance company desiring to do business in the State should furnish a sworn statement to the commissioner as prescribed, which by article 3063 was to be accompanied by a copy of its charter or the law creating it. Article 3064 required the company to designate an agent or attorney in fact on whom service might be had in case of suit, and article 3065 declared that no life or health insurance company incorporated in Texas or any other State should transact business in Texas with less capital than $100,000 actually invested. Article 3066 required insurance companies of other States to make such deposit in Texas as the laws of their home State required of Texas companies doing business there, and article 3067 provided that all foreign companies should deposit $100,000 with the state treasurer before doing business in Texas; which deposit, by article 3068, was to be applied to the payment of judgments in favor of policyholders ; but article 3069 provided that it should be sufficient if the deposit required by section 3066 was made in any other State. Article 3070 provided that suits might be brought in any county where loss occurred or where the policyholder resided.

By article 3073 it was made unlawful for any life or health insurance company to take any kind of risks or issue any policies of insurance except those of life or health, and the business of life and health insurance in the State was forbidden to be " in anywise conducted or transacted by any company, which

in this or any other State or country, is engaged or concerned in the business of marine, fire, inland or other insurance."

Articles 3074, 3075, 3076, 3077, 3078, 3079, 3080, 3083, 3084 related to marine, fire or inland insurance companies.

Articles 3081, 3082, 3086, 3087, 3089 applied to insurance companies generally.

Article 3092 read: "The provisions of this chapter shall in nowise apply to mutual benefit organizations doing business in this State through lodges or councils, such as the order of chosen friends, knights of honor, or kindred organizations." Article 3096 read: "Nothing in this title shall be construed to affect or in any way apply to mutual relief associations organized and chartered under the general incorporation laws of Texas, or which are organized under the laws of any other State, which have no capital stock, and whose relief funds are created and sustained by assessment made upon the members of said associations in accordance with their several by-laws and regulations;" but an annual statement under oath to the department of insurance was required, and the article concluded: "And should any such benevolent organization refuse or neglect to make an annual report as above required, it shall be deemed an insurance company conducted for profit to its officers and amenable to the laws governing such companies."

Article 3092 was taken from an act of April 3, 1889, entitled "An act to provide for the admission from other States of companies or associations carrying on the business of life or casualty insurance on the assessment or natural premium plan," and certain conditions were affixed to their right to do business in the State, which should not apply to mutual benefit organizations doing business through lodges or councils. Laws, 1889, p. 98.

Article 3096 was taken from an act of March 28, 1885, which amended chapter three, Title LIII of the Revised Statutes of 1879, by adding an article thereto couched in similar terms. Laws, 1885, p. 62.

In the revision of 1895 these two laws were assigned to their appropriate place under the title of insurance. Such were the conditions which for many years had been imposed on life in-

surance companies doing business in Texas when the policy sued on in this case was issued. But it is now contended that article 3071 is in conflict with the Constitution of the United States, in that it denies the equal protection of the laws, because the same conditions are not imposed on fire, marine and inland insurance companies; and on mutual benefit and relief organizations doing business through lodges and mutual relief benevolent associations, more particularly the latter.

In other words, the contention is that the classification is so arbitrary, so destitute of reasonable basis, as to be obnoxious to constitutional objection.

In *Union Central Life Insurance Company* v. *Chowning*, 86 Texas, 654, the Supreme Court of Texas held that the statute in providing for the recovery of damages and attorney's fees was not in violation of the Constitution of Texas or of the United States, and was a valid law. This decision was rendered in May, 1894, but section 2953 of the Revised Statutes of 1879 was the same as section 3071 of the Revised Statutes of 1895, and the acts of March 28, 1885, and April 3, 1889, were in force, which were subsequently brought forward as sections 3092 and 3096. The Supreme Court held that as all corporations embraced in the classes named were affected alike by the provision, it did not deny the equal protection of the laws; and the court said that the twelve per cent was given as damages for a failure to comply with the contract by payment, and the attorney's fees were allowed as compensation for the costs of collecting the debt. The court was further of opinion that even if the twelve per cent was a penalty for failure to pay when due, there was no provision of the constitution of Texas which forbade such legislation, and that it was for the legislature to determine when the public was so interested in the enforcement of contracts as to justify that enforcement by penalties.

In *Fidelity &c. Company* v. *Allibone*, 39 S. W. Rep. 632, this ruling was repeated by the Court of Civil Appeals of Texas, and affirmed by the Supreme Court in *Fidelity &c. Company* v. *Allibone*, 90 Tex. 660. Both these courts held that the constitutional question involved was distinguishable from that ruled by this court in *Railway Company* v. *Ellis*, 165 U. S. 150.

In *New York Life Insurance Company* v. *Orlopp*, 61 S. W. Rep. 336, the same conclusion was reiterated, on the ground that the state legislature had the right to provide the terms on which foreign corporations of that class might do business in the State, and that being a valid exercise of such power and right, the statute formed a part of the contract of every life and health insurance company issued and made in Texas, since the date of its enactment. The Circuit Court of Appeals for the Fifth Circuit in *Merchants' Life Association* v. *Yoakum*, 98 Fed. Rep. 251, held the section to be valid on full discussion.

It is apparent from the various sections of the title relating to insurance, to which we have before referred, that this particular liability amounted to one of the conditions on which life and health insurance companies were permitted to do business in Texas, and the power of the State in the matter of the imposition of conditions on its own and foreign corporations, has been repeatedly recognized by this court. If, however, notwithstanding the acceptance of these conditions, the constitutionality of the particular condition were nevertheless open to question, we must decline to sustain the objection. The reasoning in *Railroad Company* v. *Matthews*, 174 U. S. 96, applies rather than that in *Railway Company* v. *Ellis*. The ground for placing life and health insurance companies in a different class from fire, marine and inland insurance companies is obvious, and we think that putting them in a different class from mutual benefit and relief associations doing business through lodges, and benevolent associations of the character mentioned in the Texas statutes, is not an arbitrary classification, but rests on sufficient reason. The legislature evidently intended to distinguish between life and health insurance companies engaged in business for profit, (and we are not called on to refine as to the distribution of such profits,) and lodges and associations of a mutual benefit or benevolent character, having in mind also the necessity of the prompt payment of the insurance money in very many cases in order to provide the means of living of which the beneficiaries had been deprived by the death of the insured.

*Orient Insurance Company* v. *Daggs*, 172 U. S. 557; *Waters-*

*Pierce Oil Company* v. *Texas*, 177 U. S. 28; *New York Life Insurance Company* v. *Cravens*, 178 U. S. 384, are in point and are decisive.

In *Insurance Company* v. *Warren*, 181 U. S. 73, a section of the Revised Statutes of Ohio provided in effect that no answer to any interrogatory made by the applicant to the policy should bar the right to recovery or be used in evidence on a trial unless it was clearly proved that such answer was wilfully false and was fraudulently made, that it was material, and induced the company to issue the policy, and that but for such answer the policy would not have been used; and, moreover, that the agent of the company had no knowledge of the falsity or fraud of such answer; and this provision was only applicable to life insurance companies. The constitutionality of that act was upheld by the Supreme Court of Ohio, and this court affirmed its judgment, and in the opinion the language used in *Waters-Pierce Oil Company* v. *Texas* was quoted: "A corporation is the creature of the law, and none of its powers are original. They are precisely what the incorporating act has made them, and can only be exerted in the manner which that act authorizes. In other words, the State prescribes the purposes of a corporation and the means of executing those purposes. The purposes and means are within the State's control. This is true as to domestic corporations. It has even a broader meaning to foreign corporations." And we added: "It was for the legislature of Ohio to define the public policy of that State in respect of life insurance, and to impose such conditions on the transaction of business by life insurance companies within the State as was deemed best. We do not perceive any arbitrary classification or unlawful discrimination in this legislation, but, at all events, we cannot say that the Federal Constitution has been violated in the exercise in this regard by the State of its undoubted power over corporations."

Our conclusion is that the record shows no reversible error, and the judgment is, therefore,

*Affirmed.*

MR. JUSTICE BREWER concurred in the judgment.

MR. JUSTICE HARLAN (with whom concurred MR. JUSTICE BROWN) dissenting.

I cannot assent to that part of the opinion of the court relating to the constitutionality of the statute of Texas of 1895 which provides that a life or health insurance company, failing to pay a loss within the time specified in the policy, after demand therefor, shall be liable, *in addition* to the amount of the loss, to pay the holder of the policy " twelve per cent damages on the amount of such loss, together with all reasonable attorney's fees for the prosecution and collection of such loss."

The operation of the statute is well illustrated in the present case ; for, the verdict of the jury was for $15,000 as principal, $2250 as interest, $5175 as twelve per cent damages, (of which the plaintiff remitted $3375), and $2500 as special attorney's fees for the plaintiff.

The rule embodied in the statute is not made applicable to fire or marine insurance companies, or to any other companies or corporations doing business in Texas. Does not the State by that statute deny to life and health insurance companies, doing business within its limits, the equal protection of the laws which is secured by the Fourteenth Amendment of the Constitution of the United States?

It seems to me that this question must be answered in the affirmative if any regard whatever be had to the principles announced in *Gulf, Colorado & Santa Fé Railway* v. *Ellis*, 165 U. S. 150, 153, 154.

In that case we had before us a statute, declaring that any person in Texas having " a valid *bona fide* claim for personal services rendered or labor done, or for damages, or for overcharges on freight, or claims for stock killed or injured by the train of any railway company, provided that such claim for stock killed or injured shall be presented to the agent of the company nearest to the point where such stock was killed or injured, against any railroad corporation operating a railroad in this State, and the amount of such claim does not exceed $50, may present the same, verified by his affidavit, for payment to such corporation, by filing it with any station agent of such

corporation in any county where suit may be instituted for the same, and if, at the expiration of thirty days after such presentation, such claim has not been paid or satisfied, he may immediately institute suit thereon in the proper court; and if he shall finally establish his claim, and obtain judgment for the full amount thereof, as presented for payment to such corporation in such court, or any court to which the suit may have been appealed, he shall be entitled to recover the amount of such claim and all costs of suit, *and in addition thereto all reasonable attorney's fees,* provided he has an attorney employed in his case, not to exceed $10, to be assessed and awarded by the court and the jury trying the issue."

That statute being in force, an action was brought to recover $50 for a colt killed by the railway company. There was a judgment against the company for the amount claimed, and a special attorney's fee of $10 in favor of the plaintiff was added, as required by the above statute.

The contention in that case was that the statute made such an arbitrary discrimination against railroad companies embraced by its provisions as to bring it within the prohibition of the Fourteenth Amendment. That view was sustained. This court said : "It is simply a statute imposing a penalty upon railroad corporations for a failure to pay certain debts. No individuals are thus punished, and no other corporations. The act singles out a certain class of debtors and punishes them, when for like delinquencies it punishes no others. They are not treated as other debtors. They cannot appeal to the courts as other litigants under like conditions and with like protection. If litigation terminates adversely to them they are mulcted in the attorney's fees of the successful plaintiff ; if it terminates in their favor, they recover no attorney's fees. It is no sufficient answer to say that they are punished only when adjudged to be in the wrong. They do not enter the courts upon equal terms. They must pay attorney's fees if wrong ; they do not recover any if right ; while their adversaries recover if right and pay nothing if wrong. In the suits, therefore, to which they are parties they are discriminated against, and are not treated as others. They do not stand equal before the law.

They do not receive its equal protection. All this is obvious from a mere inspection of the statute." Referring to the Fourteenth Amendment of the Constitution, the court said : " The rights and securities guaranteed to persons by that instrument cannot be disregarded in respect to these artificial entities called corporations any more than they can be in respect to the individuals who are the equitable owners of the property belonging to such corporations. A State has no more power to deny to corporations the equal protection of the laws than it has to individual citizens." Again : " Neither can it be sustained as a proper means of enforcing the payment of small debts and preventing any unnecessary litigation in respect to them, because it does not impose the penalty in all cases where the amount in controversy is within the limit named in the statute. Indeed, the statute arbitrarily singles out one class of debtors and punishes it for a failure to perform certain duties—duties which are equally obligatory upon all debtors; a punishment not visited by reason of the failure to comply with any proper police regulations, or for the protection of the laboring classes or to prevent litigation about trifling matters, or in consequence of any special corporate privileges bestowed by the State. Unless the legislature may arbitrarily select one corporation or one class of corporations, one individual or one class of individuals, and visit a penalty upon them which is not imposed upon others guilty of like delinquency, this statute cannot be sustained. But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this."

I do not perceive how the present decision can be upheld without disregarding the principles of the *Ellis case*. If a railroad company sued in Texas upon a claim of less than $50 for killing or injuring stock, cannot be required, when unsuccessful in its defence, to pay a special attorney's fee—no such rule being established in reference to other corporations or individuals, sued for a like amount of money—I cannot understand how life and health insurance companies, alone of all corporations or companies doing business in Texas, can be required to pay special damages and special attorney's fees when unsuccess-

ful in defending suits brought against them. The two statutes are alike in this, that the defendant company or corporation, whether a railroad corporation or a life or health insurance company, even if successful in an action brought against it, could not recover special attorney's fees or special damages against its adversary. Thus the defendant company in a suit brought under either statute is not permitted to appear in court upon terms of equality with the party suing it, and is subjected to special burdens not imposed upon other companies or other corporations refusing to pay money demanded of them.

We are informed by the opinion of this court that the courts in Texas have held that the *Ellis case* was distinguishable from the present case, and we are referred to *Union Central Life Ins. Co.* v. *Chowning*, 86 Texas, 654; *Fidelity and Casualty Company* v. *Allibone*, 39 S. W. Rep. 632, affirmed in *Fidelity &c. Company* v. *Allibone*, 90 Tex. 660, and *New York Life Ins. Co.* v. *Orlopp*, 61 S. W. Rep. 336. The first named of those cases was decided more than two years before the *Ellis case* was determined by this court. The first case in Texas in which the *Ellis case* was referred to was that of *Fidelity &c. Company* v. *Allibone*. In that case the Court of Civil Appeals of Texas, after referring to certain prior decisions in that State sustaining the constitutionality of the statute here in question, said : "A late decision of the Supreme Court of the United States, *Railway Co.* v. *Ellis*, construing a somewhat analogous statute of this State, and reversing the decision of our Supreme Court approving its validity, may be at variance with the cases just cited ; but, until it is expressly so held either by our own Supreme Court or that of the United States, we will adhere to the decisions already made." The judgment in the last case was affirmed, the Supreme Court of Texas observing nothing more than that the case was "distinguishable" from the *Ellis case.* Upon what grounds the two cases were distinguishable was not stated. It is a very convenient mode for distinguishing two cases, apparently in conflict, to say nothing more than that they are distinguishable. In *New York Life Ins. Co.* v. *Orlopp*, the statute was sustained upon the ground that the State could prescribe the terms on which foreign insurance companies might do business within its limits.

This court says that the particular liability imposed by the statute in question " *amounted* to one of the *conditions* on which life and health insurance companies were permitted to do business in Texas, and the power of the State in the matter of the imposition of conditions of its own and foreign corporations has been repeatedly recognized by this court."

Of course, speaking generally, a State may impose conditions on its own and foreign corporations. But will any one say, or has this court ever directly held, that a provision of a state enactment relating to corporations, foreign or domestic, was legally operative or binding if such provision be inconsistent with the Constitution of the United States?

It is one thing for a State to forbid a particular foreign corporation, or a particular class of foreign corporations, from doing business at all within its limits. It is quite another thing for a State to admit or license foreign corporations to do business within its limits and then subject them to some statutory provision that is repugnant to the Constitution of the United States. If a corporation, doing business in Texas under its license or with its consent, insists that a particular statute or regulation is in violation of the Constitution of the United States, and cannot therefore be enforced against it, the State need only reply—such seems to be the logical result of the present decision—that the statute or regulation is a condition of the right of the corporation to do business in the State, and, whether constitutional or not, must be respected by the corporation. Corporations created by the several States are necessary to the conduct of the business of the country; and it is a startling proposition that a State may permit a corporation to do business within its limits, and by that act acquire the right to subject the corporation to regulations that may be inconsistent with the supreme law of the land.

In *Insurance Company* v. *Morse,* 20 Wall. 445, 455, 456, a statute of Wisconsin, requiring insurance companies of other States to stipulate, as a condition of their right to do business in that State, that they would not remove into the Federal court any suit brought against them in the state courts, was held invalid not only because it tended to oust the courts of the

United States of a jurisdiction conferred upon them by the Constitution, but because it created an obstruction to the exercise of a right granted by that instrument. The court said: "Every citizen is entitled to resort to all the courts of the country, and to invoke the protection which all the laws or all those courts may afford." The court further said that the right of the insurance company to remove the suit was "denied to it by the state court on the ground that it had made the agreement referred to, and that the statute of the State authorized and required the making of the agreement. We are not able to distinguish this agreement and this requisition, on principle, from a similar one made in the case of an individual citizen of New York. A corporation has the same right to the protection of the laws as a natural citizen, and the same right to appeal to all the courts of the country. The rights of an individual are not superior, in this respect, to 'that of a corporation. The State of Wisconsin can regulate its own corporations and the affairs of its own citizens, in subordination, however, to the Constitution of the United States. The requirement of an agreement like this from their own corporations would be *brutum fulmen*, because they possess no such right under the Constitution of the United States. A foreign citizen, whether natural or corporate, in this respect possesses a right not pertaining to one of her own citizens. There must necessarily be a difference between the statutes of the two in this respect."

This question was presented in somewhat different form in *W. W. Cargill Co.* v. *Minnesota*, 180 U. S. 452, 468. That was an action by the State to prevent a Wisconsin corporation from operating a warehouse owned by it until it should have obtained a license from the Railroad and Warehouse Commission of Minnesota organized under a statute of that State, and relating to elevators and warehouses. That statute provided: "It shall be unlawful to receive, ship, store or handle any grain in any such elevator or warehouse, unless the owner or owners thereof shall have procured a license therefor from the state Railroad and Warehouse Commission, which license shall be issued for the fee of one dollar per year, and only upon written application under oath, specifying the location of such elevator or

warehouse and the name of the person, firm or corporation owning and operating such elevator or warehouse, and the names of all the members of the firm or the names of all the officers of the corporation owning and operating such elevator or warehouse, and all moneys received for such licenses shall be turned over to the state grain inspection fund. Such license shall confer upon the licensee full authority to operate such warehouse or elevator in accordance with the laws of this State and the rules and regulations prescribed by said Commission, and every person, company or corporation receiving such license *shall be held to have accepted the provisions of this act, and thereby to have agreed to have complied with the same.*"

The Wisconsin corporation defended the suit brought against it upon the ground that the statute there involved was repugnant to the Constitution of the United States. This court said: "We cannot question the power of the State, so far as the Constitution of the United States is concerned, to require a license for the privilege of carrying on business of that character within its limits—such a license not being required for the purpose of forbidding a business lawful or harmless in itself, but only for purposes of regulation." Again—and this is most pertinent here—the court said: "The defendant however insists that some of the provisions of the statute are in violation of the Constitution of the United States, and if it obtained the required license, it would be held to have accepted all of its provisions, and (in the words of the statute) 'thereby to have agreed to comply with the same.' The answer to this suggestion is that the acceptance of a license, in whatever form, will not impose upon the licensee an obligation to respect or comply with any provisions of the statute or with any regulations prescribed by the state Railroad and Warehouse Commission that are repugnant to the Constitution of the United States. A license will give the defendant full authority to carry on its business in accordance with the valid laws of the State and the valid rules and regulations prescribed by the Commission. If the Commission refused to grant a license, or if it sought to revoke one granted, because the applicant in the one case, or the licensee in the other, refused to comply with statutory provisions or

with rules or regulations inconsistent with the Constitution of the United States, the rights of the applicant or the licensee could be protected and enforced by appropriate judicial proceedings."

In the case before us, the defendant company was doing business in Texas under a license issued by the State. By accepting such license, the company did not agree to submit to any local regulation that was repugnant to the Constitution of the United States. It could resist the enforcement of any regulation or statutory provision that was inconsistent with rights secured to it by that instrument.

The court says that the ground for placing life and health insurance companies in a different class from fire, marine and inland insurance companies is obvious. The only reason assigned for that statement is " the necessity of the prompt payment of the insurance money in very many cases in order to provide the means of living of which the beneficiaries had been deprived by the death of the insured." But the same reasons exist for prompt payment by a fire insurance company when the house which shelters the insured and his family is destroyed by fire. And yet, under the statute, a fire, marine or inland insurance company, if it resists a claim for loss, is not liable, when its defence is unsuccessful, to pay any special damages or special attorney's fee. It can defend any suit brought against it under the same conditions accorded to individual citizens or to corporate bodies generally. But a different and most arbitrary rule is prescribed for life and health insurance companies. Their good faith in refusing to pay a claim for loss, or in defending an action brought to enforce payment of such a claim, is not taken into account. If, in any case, they do not, within a specified time, pay the amount demanded of them, no matter what may be the reason for their refusal to pay, and if they do not succeed in their defence, they must pay not only the principal sum, with ordinary interest, but, in addition, twelve per cent damages on the amount of the principal, and all reasonable attorney's fees for the prosecution and collection of the loss. Thus the State, in effect, forbids a life or health insurance company to appear in a court of justice and defend a suit brought

against it, except subject to the harsh condition that if the jury does not sustain the defence, the company must pay special damages and special attorney's fees that are not exacted from any other defendant, corporate or individual, who may be sued for money.

This is such an arbitrary classification of corporations and such a discrimination against life and health insurance companies as brings the statute within the decision in the *Ellis case*, which has been often referred to by this court with approval. *Magoun* v. *Illinois Trust and Savings Bank*, 170 U. S. 294; *St. Louis, Iron Mountain &c. R. R. Co.* v. *Paul*, 173 U. S. 409; *Nicol* v. *Ames*, 173 U. S. 521; *W. W. Cargill Co.* v. *Minnesota*, above cited.

In my opinion, the statute in question comes within the constitutional prohibition of the denial by a State of the equal protection of the laws and should be held void.