KNIGHTS OF THE MACCABEES OF THE WORLD v. PARSONS. (No. 6938.)

(Court of Civil Appeals of Texas. Galveston. June 9, 1915. Rehearing Denied Oct. 14, 1915.)

1. INSURANCE ⟨key⟩740—MUTUAL BENEFIT INSURANCE—ASSESSMENTS—PAYMENT.

Where assured, being the record keeper of a local tent of a mutual benefit association, carrying two certificates in the order and entitled to a percentage of all assessments collected from members of the tent as remuneration, deposited the assessments collected by him in the bank selected by the local tent, without deducting his commission, such commission being more than sufficient to pay the assessments due on the certificates held by him, and while the funds were on deposit and after the time in which assessments were required to be paid,

but before the expiration of the time allowed for remittance of assessments by the record keeper to the Supreme Tent assured died, there was a distinct appropriation and setting apart of the requisite sum amounting to due payment of assured's assessments.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1887; Dec. Dig. &#9910;740.]

2. APPEAL AND ERROR &#9910;1001 — VERDICT — CONCLUSIVENESS.

In an action on insurance policies, finding of the jury that assured was in good standing at the time of his death is conclusive on appeal where the evidence was sufficient to raise that issue.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. &#9910;1001.]

3. INSURANCE &#9910;744—MUTUAL BENEFIT INSURANCE—FORFEITURE—GROUNDS.

Where there is no provision in the laws of the order or the policies of insurance therein held by assured avoiding the policies for embezzlement, the fact that assured, the record keeper of a local tent of a mutual benefit association, whose duty it was to collect assessments, was in arrears to the local tent at his death, does not render his policies void because of an obligation taken by assured to not knowingly wrong or defraud the tent.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1889; Dec. Dig. &#9910;744.]

4. INSURANCE &#9910;819—MUTUAL BENEFIT INSURANCE—DEATH OF ASSURED—SUFFICIENCY OF EVIDENCE.

In an action on life insurance policies, evidence *held* to authorize a finding that assured was dead.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. &#9910;819.]

5. INSURANCE &#9910;819—MUTUAL BENEFIT INSURANCE—DEATH OF INSURED—DEGREE OF PROOF.

In an action on life insurance policies, it is not necessary that the evidence conclusively show the death of assured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. &#9910;819.]

6. APPEAL AND ERROR &#9910;1002—SUFFICIENCY OF EVIDENCE—FINDING OF JURY—EFFECT.

In an action on life insurance policies, where the evidence is sufficient to warrant it, the finding of the jury that assured is dead is conclusive on the appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. &#9910;1002.]

Appeal from District Court, Nacogdoches County; L. D. Guinn, Judge.

Action by Lena Parsons against the Knights of the Maccabees of the World. From a judgment for plaintiff, defendant appeals. Affirmed.

J. E. Yantis, of Austin, Chas. B. Braun, of Waco, and D. D. Aitken, of Flint, Mich., for appellant. Blount & Strong, of Nacogdoches, and Kahn & Williams and Geo. S. King, all of Houston, for appellee.

McMEANS, J. Lena Parsons brought this suit against the Knights of the Maccabees of the World, an insurance organization, to recover $3,000, the sum of two life insurance policies, or benefit certificates, issued by the defendant to George Frank Parsons, the assured, payable at his death to the plaintiff, Lena Parsons, his stepmother, who was named as beneficiary in the policies. She alleged that George Frank Parsons, the assured, was dead, and that she had furnished to defendant proper notices and proofs of his death.

The defendant answered, admitting the issuance by it of the policies sued on, and specially pleaded that it was a fraternal beneficiary association without capital stock and that it was organized for the mutual benefit of its members, and further that in each of said policies it was contracted that the laws of the association in force at the maturity of the contract and the policies or certificates constituted the contract between the association and the assured, and that the benefits would only be paid at the death of the assured in the event he had complied with the laws of the association then in force or thereafter adopted. It denied that George Frank Parsons was dead, and specially denied plaintiff's right to recover upon the policies, even if he were dead, for the reason that he was not in good standing in the order at the date of his alleged death on March 2, 1913, in that he had failed to pay the assessments due upon his policies for the month of February, 1913, which failure, under the laws of the association and by the terms of the policies, ipso facto worked a forfeiture of said policies. It further alleged that the said George Frank Parsons had violated the obligations taken by him upon becoming a member of the association by knowingly embezzling the funds of the association.

The case was submitted by the court to the jury upon the three following special issues: (1) Is George Frank Parsons dead? (2) If you have answered first special issue, "Yes," then was George Frank Parsons in good standing in defendant order at the time of his death? (3) Did plaintiff furnish to defendant order proof of the death of George Frank Parsons as required by the benefit certificates sued on and the by-laws of defendant in force at the time and as pleaded by plaintiff? The jury answered each of the three special issues in the affirmative. At the request of the defendant the court submitted the following special issue:

"Is the evidence conclusive that George Frank Parsons was killed in the explosion of the Lufkin depot, March 2, 1913, or is it less than conclusive?"

To which the jury answered:

"We, the jury, answer the last issue that the evidence is conclusive that George Frank Parsons was killed in the explosion of the Lufkin depot on March 2, 1913."

Upon the return of the verdict, the court, upon motion of plaintiff, entered judgment thereon in favor of the plaintiff and overruled the motion of defendant to enter judgment upon the answers to the special issues in its favor. From the judgment thus

&#9910;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

entered, the defendant, after its motion for a new trial had been overruled, has appealed.

[1] Appellant's first assignment of error is as follows:

"The court erred in overruling the defendant's motion for a new trial because the evidence is insufficient to show that George Frank Parsons had paid his dues and assessments for the month of February, 1913, by the 1st day of March in said year, in compliance with defendant's by-laws and contract."

In his second application for a benefit certificate, made in December, 1912, George Frank Parsons agreed and warranted that his failure to pay any monthly rate or assessment which should be made by the order within the time provided by its laws, or to pay the dues fixed by its laws, or in the manner and at the time provided by its laws or the by-laws of the local lodge or "tent" to which he might belong, should vitiate his benefit certificate and forfeit all payments made thereon.

Section 330 of the laws of the order provides that:

"A life benefit member failing to pay a monthly rate, per capita tax, or additional assessment within a month from the first day on which it is due, shall stand suspended, without notice, from all rights of life benefit membership and from all the benefits and privileges of his tent."

Section 332 provides:

"These monthly rates will be due, without notice, on the first day of each month and must be paid by the member to his tent record keeper on or before the last day of the month. The first of the above monthly rates shall become due and payable on the date of admission, or on the delivery of the certificate in case of increase in the benefits, and must be paid in either case before the member shall have any right to participate in the life benefit fund of the association."

Section 309 provides that a member shall not be entitled to participate in the life benefit fund of the association for an increased amount until he has paid the record keeper of his tent an advance monthly rate of such increase.

Section 159 provides that the tent or local lodge, in performing the duties and administering the powers provided by the laws of the association, shall be the agent of the members thereof and not of the association, and that no act or failure to act by the tent, or by any officer or member thereof, shall create or be construed to create any liability on the part of the association.

Section 270 provides:

"No member shall be in good standing in the association unless he has paid all monthly rates, additional assessments, the per capita taxes, fraternal tax, dues and fines levied against him, and has complied in every particular with the laws of the association."

Section 234 declares the record keeper of the local tent to be the agent of the tent and its members and not the agent of the association, and that no act or failure to act on his part shall have the effect of creating any liability on the part of the association, or of waiving any right belonging to it.

George Frank Parsons held two policies or benefit certificates, one for $1,000 and the other for $2,000. The smaller was taken out first, and the larger, being known as the "increased benefit," was applied for by him on December 23, 1912, and the certificate therefor, duly executed by the proper officers of the association on January 7, 1913, was delivered to him on February 1, 1913. Defendant failed to show on the trial that the rates on the increased insurance had not been paid at a proper time, although resting under the burden to prove this if it would escape liability by reason of his failure to so pay; but, on the contrary, the proof adduced by plaintiff was sufficient to justify a finding that he did pay such rates in advance, and we so find.

Parsons was record keeper of his tent or lodge, and under the laws of the order it was made his duty, as such officer, to collect from each member of the local tent his monthly dues, assessments, etc., all of which fell due on the 1st day of the month. Under the laws of the association, while the dues, assessments, etc., became due on the 1st day of the month, the members had a right to pay the same at any time before the 1st day of the next succeeding month, thus giving to each member a full month after maturity in which to make payment. Under the laws of the defendant the record keeper was required to remit to the Supreme Tent the assessments collected by him during the month on the first week day after the 15th day of the next succeeding month. Thus assessments collected during the month of February, 1913, were required to be remitted on the first week day after the 15th day of March, 1913. The local tent of which Parsons was a member had selected a bank in Lufkin as a depository for the funds collected by the record keeper, and required Parsons, as such officer, to deposit such funds therein as collected. Parsons, for his services in making such collections, was allowed ten cents for the amount collected from each member. In the month of February, 1913, he collected from 34 members, thus being entitled to $3.40 as compensation; and the amount of such collections, including the $3.40 he was entitled to as his compensation, was deposited by him in the depository bank. The evidence shows that the $3.40 due him as such compensation and so deposited with other funds to be remitted to the Supreme Tent after the 15th of March was more than sufficient to pay the assessments due on February 1st, on both of the certificates held by him. In this connection P. A. McCarthy, the commander of the tent at Lufkin, testified:

"Mr. Parsons was the 'record keeper' during the months of January and February, 1913. His duties, as I before said, were to collect these dues as they became due from the individual members of the tent. He would, of course, collect from himself, or was supposed to, just the same as from anybody else. I sup-

pose that he had the money to pay his dues with. There was nothing to do except to include it when he made his report. I do not suppose he would have to do anything else except include his when he made his report. As to whether or not I understand that the way he would collect his dues from himself would be to just include his in the report, will say that is the way I would do. So far as we could tell and were advised when we made that report, Parsons was in good standing. * * * As to whether or not I feel now that he was in good standing, will say that I do not question that at all."

The jury found that Parsons was killed in an explosion in the Lufkin depot in March 2, 1913, which was nearly two weeks prior to the time he was required by the laws of the order to remit the collections made by him from the members, including himself.

[2] We think that Parsons placed in the depository of the tent, with other funds for remittance to the Supreme Tent, a sum of money sufficient to pay the amount due upon his benefit certificates for the month of February, although it was from his earnings for collections, as before shown, there was a distinct appropriation and setting apart of the requisite amount for that purpose, and that it amounted to and in fact was a payment. At least the evidence was sufficient to raise the issue, and the finding of the jury that he was in good standing at the time of his death is conclusive upon us. The court did not err therefore in refusing to grant a new trial upon the ground stated in the first assignment of error, and the assignment is overruled.

[3] Appellant by its third assignment of error complains that the court erred in overruling its motion for a new trial for the reason that the undisputed evidence shows that George Frank Parsons had embezzled a sum of money belonging to appellant in violation of his obligations to appellant. The assignment is without merit. There is nothing in the laws of the association or the contract of insurance that would render the policies void by reason of a defalcation by Parsons in his accounts. If the evidence is sufficient to show that Parsons was in arrears, it was only to the local tent, and the only contention by appellant that the policies were void on that account is the fact that Parsons, on becoming a member of the association, took upon himself an obligation to the effect that he would not knowingly wrong, or defraud, a tent, a member, or any of his family, nor permit it to be done by another if he could prevent it. The assignment is overruled.

The fourth assignment is sufficiently disposed of by our fact findings and what we have said in reaching the conclusion that the first assignment should not be sustained. The assignment is overruled.

[4] The sixth, seventh, eighth, and thirty-first assignments are grouped and presented as the tenth assignment. It is complained that the court erred in overruling appellant's motion for a new trial because: (a) The un-

disputed evidence shows that Parsons is still alive; (b) that disregarding Parson's absence the evidence failed to show conclusively that he is dead; (c) that the great preponderance of the evidence shows that Parsons is not dead; and (d) that the finding of the jury that the evidence was sufficient to show conclusively that Parsons is dead is contrary to the evidence.

On the issue of Parsons' death, the following proof was admitted:

Frank Parsons had a desk in the northeast corner of the warehouse at the depot of the Houston East & West Texas Railway Company at Lufkin on March 2, 1913, and that at 10:03 p. m. on said date from 200 to 400 pounds of dynamite which was situated near his desk in the warehouse exploded, which completely demolished the warehouse; that there was an immense fire following the explosion of dynamite and gasoline, which practically consumed the wrecked part of the building and some 18 box cars immediately surrounding the wrecked portion of the building.

Gus Stroble testified that he was with Parsons all during Sunday afternoon, and attended church with him and his sister that night; that when they returned from church Parsons bade him good-bye at the steps at their home, and said that he had to go to the depot, about a block away, to work for a while; and that he turned and started towards the depot.

Everett Parsons testified that she was with the witness Stroble and her brother, Frank Parsons, on Sunday afternoon, and that the three attended church that night, and upon their return home that Parsons said, "I am going over to the depot and finish up my work, and if Mamma needs me I will be at the office," and that he then turned and started to the depot.

The witness Runnells testified that he worked for the railroad as fireman; that he saw Parsons at the depot with the witness Holland, who was night operator, about ten minutes before the explosion; and that "Frank Parsons told me at the time that he sometimes had business down there at night."

The witness Holland testified that he was night operator at the depot, and that Parsons came to the depot first about 7 o'clock, and that he then went to church and came back about 9:55, and that they started to the W. O. W. restaurant to get a piece of pie and a cup of coffee, when Parsons stated that he had some unfinished business that he had to attend to right away in the warehouse, and turned and started back. And further:

"He was about 70 feet from the depot when he turned, and when I last saw him he was going in the baggage room. I was just then just on the edge of the W. O. W. restaurant. I was going in there to order a cup of coffee and a piece of pie for Frank Parsons and myself. When I last saw Frank Parsons he was going in the baggageroom. I was going into the W. O. W. restaurant myself, ordered two

cups of coffee and two pieces of pie. It was about four minutes from the last time that I saw Frank Parsons. I was just taking a drink of the coffee at the time I heard the explosion."

And further:

"I was in front of the W. O. W. restaurant when the explosion occurred, and that is about 140 feet from the depot. As to the effect of the explosion on the building I was in, all of the plate glass in windows and doors were broken out, and I got up—was thrown out of my chair and crawled to midway the restaurant. I got up thinking the front part of the restaurant was falling in; then I afterwards went out into the street to see what had happened."

And further:

"The whole warehouse and part of the baggage room were torn up. It was on fire. As to the effect of the fire, it was partly put out by the fire department; several cars burned up close in. There was not much there to be consumed in the warehouse department with the exception of the cars."

Mrs. Lena Parsons testified:

"My son worked on that Sunday at least part of the day. Generally he did not have to work all day on Sunday. His business was to load and unload the freight, and they run the freight trains on Sunday, and he had to work every Sunday just like every other day of the week. He worked on that Sunday that the explosion occurred. He worked until 12 o'clock, or just a little after. In the afternoon he did not work, but he went back there to work a while that night, and he would run up his local freight bills and such as that, and would generally get through when he went back that way at night about 10 o'clock at night. * * * He went to the depot that night after church to finish up his work."

And further:

"Frank was the head of our household, and had been since his father died. He had assisted me in raising the other children, his half sisters and brothers, and had always paid his money or gave it to me to run the house on, and take care of the little children. He never did have anything at all to do with society or anything like that, and he was at home always when he wasn't at work."

And further that she had not seen or heard of anything from George Frank Parsons since he left her house Sunday night to go to church; that he did not have any baggage or anything of that sort with him when he left to go to church. All of his belongings, including his trunk and all of his clothes except what he had on, were left at her house and were still there.

Everett Parsons testified:

"I have not seen or heard of George Frank Parsons since that night when he left us at the house and said he was going back to the depot to do some work."

The witness Rose testified that he had been to church with his family, and at the time of the explosion at the depot he was about 200 feet away, and was going in the direction of the crossing just south of the depot. At the time of the explosion he was looking right at the depot. And further:

"It seems there was a light at the depot that attracted my attention, and I was looking at the light at the time of the explosion. My attention had been attracted or directed to the light before the explosion occurred, not more than a minute. * * * Will say that the first

thing I observed was the building of the depot going up into the elements."

The witness Moore testified that he had been at the depot on Saturday morning before the explosion to get some dynamite; that he was using dynamite in railroad construction work; that he got 1,000 pounds of dynamite out of the depot Saturday morning, and left 400 pounds in there. And further:

"I knew George Frank Parsons. * * * He was warehouse clerk there at the depot. I knew where his desk was situated, and it was there in this warehouse or freightroom of the depot. I suppose this dynamite that was left in the depot was somewhere about six feet from his desk."

And further:

"I saw some gasoline in the freightroom, and it was leaking and I called his attention to it. I told him if he did not get that gasoline out of there and this dynamite that he was going to get blowed up."

And further that he had been using dynamite for 30 years and was acquainted with the effect of its explosion upon animate and inanimate objects, and had seen persons killed by such explosion. And further:

"It would be my opinion, from my experience in the use of dynamite and what I have seen of it in an explosion, that if Parsons had been anywhere in that room and this 400 pounds of dynamite had exploded it would have blown him to pieces. I believe if he had been anywhere in that room it would have blown him to pieces. If you can blow rock into fine sand as hard as they are, I think it would do the same with a human body, as it is nothing like a rock."

Milton Largent testified that he found Parsons' bunch of keys with his marker on it 102 steps from the depot between 10:30 and 11 o'clock on the day after the explosion.

C. Matthews testified that certain bones were found by others and himself close to the scene of the explosion about the size of a half, or a quarter, of a dollar, and that they were fresh bones and had blood on them, and that the bones were turned over to Dr. Bledsoe for a scientific examination of the bones and blood.

Dr. Bledsoe testified that he was present when the bones which were found by Matthews and assisted Dr. James, J. Terrell, professor of pathology of the Medical Department of the State University at Galveston, in making a test of the bones and blood, and that the blood, under the test, was positively demonstrated to be human blood, and that the bones were fresh green skull bones; but the particles were too small to tell whether they were human skull bones or not.

Dr. J. J. Terrell testified that he was professor of pathology in the Medical Department of the State University at Galveston at the time he and Dr. Bledsoe scientifically examined the particles of bones, blood, and hair brought by Dr. Bledsoe from the explosion at Lufkin. He testified positively that the blood upon the bones was human blood; that the bones were fresh green skull bones, and, while most too small to state positively that

they were human skull bones, that in his judgment they were human skull bones, and that the hair found imbedded in the blood, after having been compared with the hair of some 15 different animals, showed every charactistic of human hair, and was inconsistent with any other conclusion.

[5, 6] This proof, standing alone, was sufficient to authorize the jury in answering that Parsons was dead, and that he was killed in the explosion at the Lufkin depot on March 2, 1913. It was not necessary to require a finding by the jury that the evidence conclusively showed that Parsons was dead, and we are not therefore called upon to pass upon the question of whether the jury was justified in so finding. Appellant introduced in evidence quite a number of circumstances tending to combat the evidence introduced by the plaintiff on this issue, the effect of which was to show that Parsons was not dead, but this only raised a conflict in the evidence which the jury settled in favor of plaintiff; and, the testimony being sufficient to warrant a finding that he was dead, the finding of the jury is conclusive upon us. Fid. Mut. Life Ass'n v. Mettler, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 922. The assignment is overruled.

The eleventh assignment complains that the court erred in overruling appellant's motion for a new trial, for the reason that the evidence was insufficient to show that the plaintiff offered proof of death in compliance with the by-laws and the contract of insurance.

We have carefully examined the evidence in this regard, and find as a fact that proof of the death of Parsons was made in substantial compliance with the by-laws and contract. We had occasion to pass upon this question in National Life Ass'n v. Parsons, 170 S. W. 1038, where the proof on that issue was in all material respects the same as in this case, and there held the proof, which is set out in the opinion, was sufficient. We overrule the assignment.

The other assignments presented by appellant in its brief and not hereinbefore discussed have been carefully examined by us, and it is our opinion that none of them points out reversible error. We are of the opinion that the judgment of the court below should be affirmed, and it has been so ordered.

Affirmed.