FRANCES C. BERNSTEIN *vs.* METROPOLITAN LIFE INSURANCE COMPANY OF NEW YORK, Docket No. 954.

ALBERT BERNSTEIN, A MINOR BY FRANCES C. BERNSTEIN, HIS MOTHER AND NEXT FRIEND, *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 955.

JOSEPH BERNSTEIN *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 956.

SELDON BERNSTEIN, A MINOR BY FRANCES C. BERNSTEIN *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 957.

ROBERT L. BERNSTEIN, A MINOR BY FRANCES C. BERNSTEIN *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 958.

FRANCES C. BERNSTEIN *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 959.

FRANCES C. BERNSTEIN, JOSEPH BERNSTEIN, HELEN BERNSTEIN GANS, AND SELDON BERNSTEIN, ALBERT BERNSTEIN AND ROBERT BERNSTEIN, MINORS UNDER AGE OF 21, WHO BRING THIS ACTION BY FRANCES C. BERNSTEIN, MOTHER AND NEXT FRIEND, *vs.* THE MACCABEES, Docket No. 960.

ALLAN COHEN, ADM'R OF THE ESTATE OF CHARLES J. BERNSTEIN, DECEASED, *vs.* NEW YORK LIFE INSURANCE COMPANY OF NEW YORK, Docket No. 961.

ALLAN COHEN, ADM'R OF THE ESTATE OF CHARLES J. BERNSTEIN, DECEASED, *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 962.

ALLAN COHEN, ADM'R OF THE ESTATE OF CHARLES J. BERNSTEIN, DECEASED, *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 963.

HELEN BERNSTEIN GANS *vs.* NEW YORK LIFE INSURANCE COMPANY, Docket No. 966.

JOSEPH BERNSTEIN AND HELEN BERNSTEIN GANS *vs.* THE MACCABEES, Docket No. 967.

Penobscot.    Opinion, April 14, 1943.

*Michael Pilot,* and *Abraham Stern,* for the plaintiffs.

*James E. Mitchell,* for Metropolitan Life Insurance Company of New York.

*Fellows & Fellows,* and *A. M. Rudman,* and *Leon V. Walker,* for New York Life Insurance Company.

*Cecil H. Burleigh,* and *Reginald Harris,* for The Maccabees.

SITTING: HUDSON, MANSER, MURCHIE, CHAPMAN, JJ.

HUDSON, J. These twelve actions, by consent heard together before three referees, come up on defendants' exceptions to acceptances of their reports. The exceptions are practically

identical except that in the two Maccabees cases additional errors are claimed. The suits were brought to recover upon life insurance policies and benefit certificates on account of the alleged death of one Charles J. Bernstein, formerly of Bangor.

The principal contention of all defendants is that the record does not disclose a sufficient quantum of proof of death of the insured. Without extended reports the referees found that the plaintiff in each case was entitled to recover a specified amount. These amounts are not contested if there be liability. Although there were no expressed findings of particular facts, it must be assumed that the referees found for the plaintiffs upon all issues of fact necessaily involved. *Chabot & Richard Co.* v. *Chabot,* 109 Me., 403, 405, 84 A., 892. So it must be assumed that these referees found for the plaintiffs on the issue of death.

In this jurisdiction, "Questions of fact once settled by Referees, if their findings are supported by any evidence, are finally decided. They and they alone are the sole judges of the credibility of witnesses and the value of their testimony." *Staples* v. *Littlefield,* 132 Me., 91, 93, 167 A., 171, 172; *Richardson* v. *Lalumiere,* 134 Me., 224, 227, 184 A., 392.

It seems to have been conceded that Mr. Bernstein, the insured, disappeared on December 27, 1939, and that since then there has been no intelligence with respect to him, although search and inquiry were made. These actions were brought about seven months after the disappearance — that is, within the seven-year period during which there is a presumption of continuance of life and after which, "without intelligence respecting him, the presumption of life will cease, and it will be incumbent on the other party asserting it, to prove that the person was living within that time." *Stevens* v. *McNamara,* 36 Me., 176, 178, 179, 58 Am. Dec., 740; *Wilson, Adm'x* v. *Insurance Co.,* 132 Me., 63, 65, 66 A., 57, and cases cited therein.

These presumptions of life and death as well as the presumption against death by suicide may be repelled by sufficient proof of facts. Even during the seven-year period while the pre-

sumption of continuance of life exists, "Death may be proved by showing facts from which a reasonable inference would lead to that conclusion. . . ." *Johnson* v. *Merithew*, 80 Me., 111, 115, 13 A., 132, 133, 6 Am. St. Rep., 162.

Whether death has taken place is a question of fact for the triers of facts and "Each case must be decided by the competent tribunal upon proof of the facts and probabilities, that life has been destroyed." *White* v. *Mann*, 26 Me., 361, 370. Death may be established by facts proven and proper inferences based thereon and where the evidence is undisputed, yet if different legitimate inferences may be drawn from it, a question of fact is presented for the jury (here the referees). *Whitehouse* v. *Bolster*, 95 Me., 458, 461, 50 A., 240, a case, however, not involving death but pertinent in principle.

During the existence of the presumption of continuance of life, the fact of mere disappearance is insufficient to prove death, but disappearance, where there is no intelligence as to the absentee, although search and inquiry are made, together with other circumstantial facts proven with legitimate inferences based thereon, may be sufficient to establish death. Herein the facts tending to show death were circumstantial, not direct.

Death need not be proved beyond a reasonable doubt. Where the evidence is only circumstantial and " 'two equally plausible conclusions are deducible from the circumstances,' the jury" (the referees herein had jury rights) "may decide which it shall adopt . . . and 'every other reasonable conclusion than the one arrived at need not be excluded in civil actions.' " *Cox* v. *Metropolitan Life Ins. Co.*, 139 Me., 167, 28 A. (2d), 143, 145.

In the cases at bar, our duty is simply to determine whether the findings of the referees were supported by *any* evidence of *probative* value, not by a fair preponderance of it. As stated in *Staples* v. *Littlefield*, supra, on page 93, "We are not, therefore, obliged to study the voluminous report of the evidence in this case for the purpose of ascertaining on which side the evidence

preponderates or what testimony we regard as most entitled to credence.... The parties to this controversy submitted their cause to a tribunal of their own choosing. To it they entrusted, without limitation, the power to decide questions of fact. Having chosen to go to that tribunal, they cannot now be heard upon the merits of this Court so long as there was produced before the Referees any evidence upon which could be based a decision."

The record discloses that Charles J. Bernstein, the insured, when he left his home in Bangor on December 27, 1939, was a man fifty-five years old, living with his wife fourteen years younger than he, four children by her, the oldest fourteen, twins thirteen, and a month old baby, together with his son, Joseph, twenty-five years old, issue of a former marriage. By that marriage he also had a daughter, Helen (older than Joseph), who lived in Connecticut. His home life was happy; he was an affectionate husband and father. He had had a cheerful disposition and had seemed to enjoy life, but there was much evidence that at least for several months before his disappearance he was extremely unhappy. It pictured him as a greatly discouraged man whose spirit had been sadly broken, so enmeshed with crushing circumstances that return to his former status of happiness and contentment seemed to him impossible. It disclosed many facts of recent occurrence before the disappearance from which the referees could have found that Mr. Bernstein believed his future was to contain only disgrace and sorrow which would deprive him of all desire to continue on fighting the battle of life.

He was a small loan investor and insurance broker. He never had been affluent. Mostly he hired his capital. His income was dependent on his ability to receive a higher percent on money he loaned than he paid in borrowing, and had diminished greatly. When he disappeared, he was hopelessly insolvent, his indebtedness exceeding his assets by more than $30,000. Upon pressure, he faced bankruptcy. "His insurance premiums were pressing him." He had borrowed practically

all he could from friends, relatives, and others. He had exhausted his credit at the bank, where he was in default. The loan values of his insurance policies had become almost nil. His home was heavily mortgaged.

He was a proud man and in the past had secured the confidence and respect of those with whom he had dealt. His inability to pay two of his creditors in particular, his aged uncle and an elderly friend, Mr. Zinn, disturbed him greatly. His disclosed purpose of leaving Bangor on December 27th was to try to procure a loan in Boston from one whom he had known for years for aid in paying his note to Mr. Zinn. Originally he had borrowed $5,000 from him. Some months before his departure he had with much difficulty raised $2,000 and had reduced the Zinn loan to $3,000, for which balance he gave him his note payable on January 1, 1940. Immediate payment of this he faced upon leaving home. When his son, Joseph, was taking him to the station to entrain for Boston, he told him that "George Zinn had showed him more consideration than most of his friends" and that "he was going to pay George Zinn off if it was the last thing he was ever going to do." He had already stated that "he was in so deep he didn't know how he was ever going to come out of the hole" and that "he was paying more interest than he was earning." He also said he couldn't face bankruptcy because of his friends, that "he couldn't let down his uncle Harris, who was eighty-five years old, and George Zinn and the rest of his friends."

Upon his arrival in Boston, without success he sought a loan of $1,500 from Mr. Garrity, an old acquaintance. The most he could obtain from him was $50, which he would not accept. It would afford no relief. When he left Mr. Garrity he told him that he would be sorry. Two days later Garrity read in the Boston papers that Mr. Bernstein was missing off the Boston-New York boat.

Recently his secretary, a young lady, had noticed how depressed he was. She kept his books and had knowledge of his

financial situation. She volunteered a loan of $500 to him from herself and her sister. He took it but returned it almost at once, saying that he couldn't keep it because they worked too hard to get the money.

His daughter visited him during his wife's convalescence from childbirth only a short time before he disappeared and noted the change in him. She tried to get him to take a small amount of money from her, but he could not bring himself to do it. He knew it could be of no help to him considering his needs. He told her he was "so deep in it he never had been so deep in financial difficulties before and he just didn't know what he was going to do." At another time he said to her, "I don't know just what to do, but I am going to do something about it real soon."

Many nights when Joseph, his son, came home late he found his father pacing the floor, apparently in great distress of mind.

In the latter part of November, 1939, The Merrill Trust Company was pressing him for payment of a deficiency of $1,000 on notes he had discounted at the bank, money he had collected and had not turned in.

He had procured two loans from a Mr. White, $5,000 in 1938 and $1,000 in the spring of 1939, the former secured by a policy of insurance. After the birth of the baby, White refused him another loan. He told Mr. White that he had "some internal trouble, it is serious, and I don't expect to live very long." Once when Mr. White was at his office to collect interest money, he said, "Well, you have had a pretty good time all your life, haven't you?" which White admitted. Then said Mr. Bernstein, "If you was to die you wouldn't be missing much, would you?" Then later he added, "I have had a pretty good time all my life; . . . I realize if I live much longer I wouldn't have much of a good time, and it wouldn't bother me any if I was to die tomorrow." "And then," said White, "he gave a big laugh as if it was kind of a joke." But was it?

When Mr. Bernstein left his office the day before he went to Boston, he said to his secretary, "Thank you for all your past favors," a thing she said he had never done before.

When leaving his son at the station in Bangor, he said, "Aren't you going to wish me luck?"

Mr. Russ, vice president of The Merrill Trust Company, who had had charge of Mr. Bernstein's credit at the bank, testified that he noticed "a great change" in him "the latter part of 1939"; that Mr. Bernstein had more or less difficulty in the summer and fall of 1939 in getting enough money to loan to make enough for him to live on, that he was always trying to get more money from the bank and because he couldn't he was very much disturbed and particularly because his credit had already been reduced. When he attempted to congratulate him upon the birth of the child, Mr. Bernstein told him he didn't think congratulations were in order. It seemed to be, he said, more or less the last blow, for "I don't know what I am going to do." Like testimony was also given by Mr. Colby, another officer of the bank. Mr. Bernstein also told his daughter, Helen, that "He felt that at his age and present financial condition that he had really no right to bring a child into the world. He said to me that he wished it were my baby instead of his own." He also told Mr. Zinn "he had almost persuaded his wife to submit to an illegal operation but somehow or other he couldn't seem to convince her and he wished he had been able to."

After Mr. Bernstein's conference with Mr. Garrity in Boston, he wired his wife in Bangor, "NO LUCK LEAVING TONIGHT BOAT INTERVIEW NEW YORK PARTY HOME FRIDAY LOVE — CHARLIE." About 5:30 o'clock on the afternoon of December 27th the steamship *Acadia* sailed from Boston for New York by way of Cape Cod Canal. This boat, having seven decks (two for freight), was 403 feet in length and 61 feet in breadth. "A" was the topmost deck and beneath in order were "B," "C," "D," etc. Its passenger capacity was 750. On this night there were 160 passengers. The next morning it was discovered

in New York that outside stateroom 251 on Deck "D" was locked, its key missing, and that inside there were a pair of men's rubbers and a black leather bag, containing among other things some of Mr. Bernstein's personal correspondence. Later this bag was positively identified as property of Mr. Bernstein. It was also learned on investigation that the landing stub of one of the tickets from Boston was missing. All others were accounted for.

The company records disclosed that one "C. J. Bernstein" had purchased stateroom 251. The bed therein showed that it had not been slept in that night, but a bodylike outside impress indicated that someone had lain on it.

The insured was identified as a passenger that night by Mr. Canty, Chief Steward of the *Acadia*. He testified that for about 25 minutes just before nine o'clock in the evening he sat within four feet of him on the quarterdeck watching a horse race game. He said he was "pensive and quiet." He thinks this was while they were yet in the Canal, which ordinarily it takes about an hour and a quarter to pass through. Then emergence is into Buzzards Bay and from there on the trip is on the open sea to New York with land at varying but long distances.

Considerable testimony was introduced as to conditions at the pier in New York where this boat landed with reference to the possibility of one's jumping down from "C" deck rail a distance of approximately 15 feet onto a two and one-half to three feet wide walk against the blank wall of a warehouse there situate (the walk used by linemen in hauling in and securing hawsers), and keeping from falling off into the water. The evidence tended strongly to show that this was practically impossible for any person, and all the more so for Mr. Bernstein, who had a tubercular hip, was lame, and had much difficulty in walking. One would reasonably expect that such a spectacular feat in that place, even though accomplished, would likely have attracted attention of eye witnesses.

The defendants insist that the finding of death by the

referees was obtained without sanction of law by piling inference upon inference. In the recent case of *Bechard, Adm'x* v. *Lake*, 136 Me., 385, 391, 392, 11 A. (2d), 267, 270, it is stated: "When it is sought to establish a case upon inference drawn from facts, it must be from facts proven. Inferences based on mere conjecture or probabilities will not support a verdict." Also see *Seavey* v. *Laughlin*, 98 Me., 517, 518, 519, 57 A., 796; *McTaggart* v. *Railroad Co.*, 100 Me., 223, 230, 60 A., 1027; *Titcomb* v. *Powers*, 108 Me., 347, 349, 80 A., 851; *Alden* v. *Railroad Company*, 112 Me., 515, 518, 92 A., 651; *Kerr* v. *Dyer*, 116 Me., 403, 405, 102 A., 178; *Mahan* v. *Hines*, 120 Me., 371, 378, 115 A., 132; *Syde's Case*, 127 Me., 214, 217, 218, 142 A., 777; *Ward* v. *Power & Light Co.*, 134 Me., 430, 433, 187 A., 527.

Professor Wigmore, in his Third Edition of *Wigmore on Evidence* says in Vol. 1, Sec. 41, beginning on page 434:

"It was once suggested that an 'inference upon an inference' will not be permitted, *i.e.* that a fact desired to be used circumstantially must itself be established by testimonial evidence; and this suggestion has been repeated by several Courts, and sometimes actually enforced.

"There is no such orthodox rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it; and from this we infer that it was his bullet which struck and killed the deceased. . . . In these and innumerable daily instances we build up inference upon inference, and yet no Court (until in very modern times) ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data. . . ."

In 95 A. L. R., beginning on page 162, is an exhaustive annotation on "Inference on inference; presumption on presumption." Finally, on page 186, it is stated:

"What appears to be the true rule is well stated in another opinion of that court," (Indiana) "in which, after referring to the contention that its conclusion violated the rule that probative force may not be assigned to an inference deduced from another inference, the court said: 'There is a rule to that effect. It, however, is frequently misinterpreted and misapplied. For the purpose of supporting a proposition, it is not permissible to draw an inference from a deduction which is itself purely speculative and unsupported by an established fact. Where an inference not supported by or drawn from a proven or known fact is indulged, and is then used as a basis for another inference, neither inference has probative value. Such a process may be described as drawing an inference from an inference, and is not allowable. At the beginning of every line of legitimate inferences there must be a fact, known or proved.... Where there is such a fact, the proper tribunal is not only permitted to, but also it is its duty to, draw therefrom those legitimate inferences that seem to be most reasonable. An inference so drawn becomes a fact in so far as concerns its relation to the proposition to be proven. It merges itself into the proven fact from which it was deduced, and the resulting augmented fact becomes a basis for other proper inferences. To assign to an inference properly drawn a position inferior to an established fact would in effect nullify its probative force.' "

But it is not necessary herein to consider whether the rule which seems to have been adopted in this state should now be abandoned, for we think that without piling inference upon inference and without basing inferences on mere conjectures a finding of death by suicide was justified by facts proven and legitimate inferences founded thereon. Granting the soundness of the rule, fact A when proven may warrant inference A' when reasonable and proper, and so fact B may warrant inference B', and other proper inferences may be drawn from

tween two situations, one involving a direct line of inferences from a base fact to an ultimate conclusion, and the other where from many proven facts as many legitimate inferences are derived and the ultimate fact is determined by considering the weight of these independent facts and inferences therefrom.

In *Bechard, Adm'x* v. *Lake,* supra, this court recently, although it recognized the rule, nevertheless collected the facts proven with their legitimate inferences and from them found lack of proof of the exercise of due care.

In *Hanzes* v. *Flavio,* 234 Mass., 320, 125 N. E., 612, the question was whether the death of a soldier had been established. When last seen he was engaged in a battle in Greece and then was uninjured. Since then he had not been seen or heard from. · It appeared that funeral services in his memory were held by his relatives in his native town in Greece and that they had written their friends in this country that he was dead, although they had no personal knowledge of his death. It was also shown that the soldier left property in Massachusetts on which administration had been taken out. The court held that these facts were all competent evidence upon the question of death and said on page 328: "Collectively such facts were sufficient to support a finding that he died in the battle or shortly thereafter."

In *Johnson et al.* v. *Merithew,* supra, the court held the evidence sufficient to justify a finding that a vessel was lost with all on board within six months after sailing and said on page 115 of 80 Me.:

'Death may be proved by showing facts from which a reasonable inference would lead to that conclusion, as by proving that a person sailed in a particular vessel for a particular voyage and that neither vessel nor any person on board had been heard of for a length of time sufficient for information to be received from that part of the globe where the vessel might be driven or the persons on board of her might be carried."

In *White* v. *Mann*, supra, the court said on page 370:

"The time, when such presumption" (of death) "will arise, may be greatly abridged by proof, that the person has encountered such perils as might be reasonably expected to destroy life, and has been so situated, that according to the ordinary course of human events he must have been heard of, if he had survived."

Likewise, *Fidelity Mutual Life Association* v. *Mettler*, 185 U. S., 308, 22 S. Ct., 662, 46 L. Ed., 922, was a case dealing with inference of death by drowning. The court said on page 316 of 185 U. S.; page 922 of 46 L. Ed.:

"In our opinion the evidence was sufficient to justify the inference that Hunter was drowned in the Pecos river, on December 4, 1896, and the court below properly refused to peremptorily instruct the jury to find for defendant."

Then followed a recitation of facts and circumstances which were held sufficient to justify the finding of death. The following instruction was upheld:

"While death may be presumed from the absence, for seven years, of one not heard from, where news from him, if living, would probably have been had, yet this period of seven years during which the presumption of continued life runs, and at the end of which it is presumed that life ceases, may be shortened by proof of such facts and circumstances connected with the disappearance of the person whose life is the subject of inquiry, and circumstances connected with his habits and customs of life, as, submitted to the test of reason and experience, would show to your satisfaction by a preponderance of the evidence that the person was dead."

In the Mettler case is cited *Davie* v. *Briggs*, 97 U. S., 634, 24 L. Ed., 1086, in which Mr. Justice Harlan said:

> "If it appears in evidence that the absent person, within the seven years, encountered some specific peril, or within that period came within the range of some impending or immediate danger, which might reasonably be expected to destroy life, the court or jury may infer that life ceased before the expiration of the seven years."

Then Chief Justice Fuller, who wrote the opinion in the Mettler case, pointed out that there might be an inference of death where there was a disappearance if the circumstances were inconsistent with a continuation of life, even though exposure to some particular peril was not shown and the evidence indicated that the absentee came within the range of immediate danger. Also see *Tisdale* v. *Connecticut Mut. Life Ins. Co.*, 26 Iowa, 170, 96 Am. Dec., 136, 137.

In *Continental Life Ins. Co.* v. *Searing*, 240 F., 653, the last seen of the insured was when he "was just entering the surf" and the court held that that with other facts in the case constituted sufficient proof of death.

In *Occidental Life Ins. Co.* v. *Thomas*, 107 F. (2d), 876, the insured was in a boat at dusk and not therein the next morning. It held that it was not necessary that the proof preclude all possible inference except that of accidental drowning. The court added:

> "Thomas may be still alive, or if dead, it may be that he died from other than accidental causes; but the facts essential to a recovery need not be established to a moral certainty or beyond a reasonable doubt. This is a situation where . . . the same evidence not only supports the inference of death, but also points to the cause of it."

In *United States* v. *Hayman*, 62 F. (2d), 118, it is stated on page 120:

> "The Supreme Court of the United States has itself declined to accept as exclusive the rule of Davie v. Briggs, that proof must be made that at the time of the disappear-

ance the person was subjected to peril or danger. Fidelity Mutual Life Ins. Co. v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922; cf. Wigmore Evid., Sec. 2531. In that case it was declared that the inference of death might arise from a disappearance *inconsistent with the continuance of life* even though exposure to particular peril is not shown." (Italics ours.)

In *Prudential Ins. Co. of America* v. *Stewart*, 286 F., 321, the court said on page 324:

"When we add to those circumstances and facts the evidence that Stewart could not swim, and that the current of the Columbia river was strong, the inference drawn by the District Court that Stewart was drowned becomes entirely reasonable, and there is far from enough to enable us to say that it is not fair and proper."

In *Bergman* v. *Supreme Tent, Knights of Maccabees*, 203 Mo. App., 685, 220 S. W., 1029, the court states on page 1032 of 220 S. W.:

"Here it is not necessary that the absent person should have been in contact with a specific peril, and the death may be inferred where the circumstances of the disappearance are *inconsistent with a continuation of life.*" (Italics ours.)

In *Rose* v. *United States*, 4 F. Supp., 340, where it appeared that one Carpenter was on board a ship anchored by the side of another, but later disappeared, the court, sustaining a finding of death, said on page 341: "The inference is inescapable that he either fell overboard or jumped overboard with an intention of swimming to land," and then on page 342 stated that "The circumstances surrounding the disappearance of Carpenter justify a finding that his death soon followed upon his leaving the ship, whether intentional or otherwise."

This from 25 C. J. S., Sec. 9, on page 1065 et seq.:

"In civil cases, death may be proved by proof of facts raising a presumption of death, or by direct evidence. Death may also be proved in some instances by circumstantial evidence. Wide latitude is allowed in the admission of evidence to prove death. Thus any facts or circumstances relating to the habits, character, condition, affections, attachments, prosperity, and objects in life, which usually control the conduct of men and are the motives of their actions, are competent evidence from which may be inferred the death of one absent and unheard from, whatever may have been the duration of such absence, but these facts must have occurred, or the character have been recognized, within such reasonable time prior to the death sought to be proved that they may justly be supposed to afford some light tending to establish or refute it, for remote acts as well as remote consequences are excluded. The age and health of the absentee, his purpose at the time he left, any peril that he may have encountered, the duration of his absence, his failure to claim rights, the absence of tidings, and the extent of the search made are all proper for consideration. . . . An inference of death, founded on a reasonable probability, must prevail against mere possibilities."

The last sentence quoted has significance with reference to the claim of the defendants that there was a possibility that Mr. Bernstein intended "a possible disappearance alive."

The defendants rely on *Howard* v. *Equitable Life Assur. Soc.*, 197 Wash., 230, 85 P. (2d), 253, in which is was held that ". . . there were not sufficient facts presented to prove the death of the insured without the aid of the presumption arising after the expiration of the seven years' absence." It was claimed that the insured fell or threw himself from a ferry boat into Lake Washington and drowned. He had been absent for more than seven years at the time of the trial, but the plaintiff sought to prove death within the seven-year period

so as to come within coverage of the policy. The court said on page 255 of 85 P. (2d):

"While death, like any other fact, may be proved by circumstantial evidence, the evidence discloses no reason for Mr. Navone's disappearance except his mental condition. He was devoted to his wife and their children. He was well thought of in his community. He was not in a position of peril when last seen. No one saw him drown, and while he talked of suicide he had never been guilty of any act wherein he sought to take his own life."

The court was dealing with a factual question, as did the jury, which found that death had been established.

It is not claimed, of course, that we are bound by that decision. Hardly ever if ever are the facts in two cases exactly alike. Here there are dissimilarities. But even upon like facts different courts may arrive at different conclusions. We believe that our court, in view of the reasoning in decisions hereinbefore cited, would have reached the conclusion in the Howard case that the insured did either fall or jump into the lake and drown.

As above stated in several cited cases, it is not absolutely necessary that the absentee be in a position of peril when last seen. If he is, that is just one additional circumstance tending to show death, but failure to prove that fact does not prevent other circumstantial facts when of sufficient probative value from proving death.

Reverting to the facts in the cases at bar, we think that on this record the referees could have found and no doubt did find: first, that Mr. Bernstein embarked on this boat in Boston; second, did not disembark in New York; and third, was not on the boat when it landed. It follows by necessity that during that trip, probably between the western end of the Canal and New York (the boat made no landing between Boston and New York), he disappeared from it by jumping into the ocean, his purpose being self-destruction.

True, it does not necessarily follow that he was drowned, but as above noted, proof of death does not require absolute certainty. Was it reasonably probable under the facts proven and proper inferences therefrom that he drowned? We think so. For him to have survived, if he had any such desire, either he would have had to swim ashore or have been rescued by some boat or other agency. There is no evidence of any such means available. Still, it is possible that he was saved, although not probable. But as hereinbefore stated, a reasonable probability need not yield to a mere possibility. The question before the referees, it is true, was whether the death had been established by a fair preponderance of the evidence. While we think it was, that is not the question before this court. Can we say, the case having been heard before referees, that there was no evidence of probative value to establish the death? We cannot.

It was also claimed that the evidence did not establish that diligent search and inquiry for Mr. Bernstein were made after his disappearance. The rule is that such search and inquiry shall be made as a reasonably prudent person would make in view of the circumstances. 25 C. J. S., Sec. 6, d, on page 1059. Also see *Modern Woodmen of America* v. *Michelin*, 101 Okl., 217, 225 P., 163, where the court said on page 167 of 225 P.:

"... the party upon whom devolves the duty to make inquiry concerning the missing one is required to make only such search and inquiry at such places and sources of information and from such persons as a reasonably prudent person under the same or similar circumstances would deem to be sufficient under the terms of the rule as stated."

Also see *Wentworth* v. *Wentworth*, 71 Me., 72, 74; *Chapman* v. *Kimball*, 83 Me., 389, 395, 22 A., 254; *Stockbridge, Petitioner*, 145 Mass., 517, 519, 14 N. E., 928. We consider there was full compliance with the rule.

## The Maccabees Cases.

We will now consider certain additional points made in the Maccabees cases.

In the benefit certificates issued by the Maccabees the promise to pay was "upon proof of *actual* death." (Italics ours.) Counsel contend that a variance exists between the pleadings and proof, that breach of one contract was alleged and breach of another proved. As permitted by Sec. 40, Chap. 96, R. S. 1930, the plaintiffs declared in "indebitatus assumpsit on an account annexed" to recover "proceeds due on insurance policy" number etc., which contained the promise as above stated. Inasmuch as actual death was proved, although by circumstantial evidence, there was no variance.

In *Steen* v. *Modern Woodmen of America,* 296 Ill., 104, 129 N. E., 546, the court stated on page 549:

"Much of the argument is based upon the theory that this by-law excludes proof of death by circumstantial evidence."

The by-law referred to provided:

"No lapse of time or absence or disappearance on the part of any member heretofore or hereafter admitted into the society, without proof of *the actual death* of such member while in good standing in the society, shall entitle his beneficiary to recover. . . ." (Italics ours.)

Then in comment upon this by-law the court continued on page 549 of 129 N. E.:

"We do not think the by-law subject to this construction. The law is well settled in this state that death may be proven by circumstantial evidence, and we do not consider that the by-law attacks in any way that established principle."

Also in *De Vore-Norton* v. *Brotherhood of Locomotive F. and E.,* 132 Okl., 130, 270 P., 12, it was held that although the

insurance contract calls for "positive proof" of death, such proof may be by circumstantial evidence.

Likewise, it is claimed by counsel for the Maccabees that Sec. 281 of their by-laws prevents recovery. This by-law reads as follows:

> "The absence or disappearance of a member of the Association from his last known place of residence for any length of time, shall not be evidence of the death of the member, and no right shall accrue under the certificate of membership to a beneficiary nor shall any benefits be paid *until conclusive proof* has been made of the death of the member aside from any presumption that might arise by reason of his absence, provided when death is established by presumption of law, or when death has occurred in violation of the laws of this Association, or the laws of the land, then and in such cases the full liability of the Association shall be the reserve maintained by the Association in that case...." (Italics ours.)

It will be observed that the first clause has to do with what shall not be evidence of death and that the remainder of the section relates to liability. The gist of the latter part of the section, as we view it, is that proof of death simply by use of the presumption is insufficient, but that in addition thereto to recover there shall be other "conclusive proof," with this qualification, that when the death is established only by presumption of law, liability shall be limited to the reserve maintained by the Association in that case. The section does not forbid recovery when proof is established by circumstantial evidence, but it is provided that such other proof shall be "conclusive."

Then what was intended by the use of the word "conclusive"? Absolutely conclusive? So conclusive as to admit of no doubt or even of a reasonable doubt? Or was "conclusive" intended to have the meaning of "positive" so that there must be positive proof of death?

"A stipulation for 'positive proof of death' means proof as positive as the circumstances reasonably afford, and positive enough to satisfy the judgment of reasonable men, the production of the body not being indispensable." 7 Couch on Insurance, page 5494, Sec. 1542, and cases there cited.

The above questions, however, we need not answer, because, granting without admitting that "conclusive" was intended to mean proof so conclusive as to constitute proof beyond a shadow of doubt, the by-law would be void and against public policy in the state of Michigan, the Maccabees' domicile, the law of which state governs its validity. *Modern Woodmen of America* v. *Mixer*, 267 U. S., 544, 45 S. Ct., 389, 69 L. Ed., 783, 41 A. L. R., 1384; annotation in 60 A. L. R., 592.

In *Utter* v. *Travelers' Ins. Co.*, 65 Mich., 545, 32 N. W., 812, the Michigan court stated on page 816 of 32 N. W.:

"Courts will not permit the course of justice, upon trials before them, to be stipulated or contracted in such manner as to defeat the ends to be subserved by such trials. The parties to the contract cannot agree to oust the courts of jurisdiction over such contract. The operation of this clause, *requiring direct and positive proof,* in many cases would, in effect, preclude the court from jurisdiction and bar recovery. If they can make this agreement, they can also stipulate that the evidence must come from certain persons, or make any agreement they see fit, controlling and directing the course of proceeding upon the trial. They may contract in relation to a condition precedent before bringing suit, or in relation to anything going to the remedy, but not to the right of recovery itself. Wood, Ins. 750. Circumstantial evidence is regarded by the law as competent to prove any given fact; and sometimes it is as cogent and irresistible as direct and positive testimony." (Italics ours.)

This opinion came down April 28, 1887, but as recently as April 3, 1934, that court in *Leahey* v. *State Life Ins. Co.*, 266 Mich., 631, 254 N. W., 229, stated on page 230: "We have held that courts will not permit the course of justice, upon trials before them, to be stipulated or contracted in such a manner as to defeat the ends to be subserved by such trials," and then as authority cited the Utter case, supra. We do not find that the law enunciated in the Utter case, supra, has since been modified in that state. Many times in other states it has been cited with approval, although not always. For some of the approving cases, see *Haines* v. *Modern Woodmen of America*, 189 Iowa, 651, 178 N. W., 1010, on page 1015; *Ellis* v. *Interstate Business Men's Acc. Ass'n*, 183 Iowa, 1279, 168 N. W., 212, 215; *Fleming* v. *Merchants' Life Ins. Co.*, 180 N. W., 202, 205 (Iowa); *Gaffney* v. *Royal Neighbors of America*, 31 Idaho, 549, 174 P., 1014, 1016; *Hannon* v. *Grand Lodge, A. O. U. W. of Kansas*, 99 Kan., 734, 163 P., 169, 171; *Smith* v. *Maryland Casualty Co.*, 63 N. D., 99, 246 N. W., 451, 453; *Rollins* v. *Business Men's Acc. Ass'n*, 204 Mo. App., 679, 220 S. W., 1022, 1026; *McCormick* v. *Woodmen of the World*, 57 Cal. App., 568, 207 P., 943, 944; *American Casualty Co.* v. *Horton*, 152 S. W. (2d), 395, 398 (Texas); *Fleming* v. *Merchants' Life Ins. Co.*, 193 Iowa, 1164, 188 N. W., 703, 706; *American Ben. Life Ass'n* v. *Hall*, 96 Ind. App., 498, 185 N. E., 344, 345; *Campbell* v. *Monumental Life Ins. Co.*, 34 N. E. (2d), 268, 274 (Ohio); *Fernandez* v. *Sovereign Camp. W. O. W.*, 142 Kan., 75, 46 P. (2d), 10, 14.

But it is not a question of what the law is in this regard in any state except Michigan — not even in Maine. The law in Michigan seems plainly to declare against the validity of such a by-law. We need not affirm or disaffirm its soundness. We are herein compelled to accept it as law in that state which governs us in these Maccabees cases.

Finally, it is claimed by counsel for the Maccabees that due proofs of claim were not furnished because of failure to set forth therein the time and place of death. An examination of

·the proofs, however, shows that the facts attending the disappearance were set forth in detail including the date and place of embarkation on *S. S. Acadia,* the departure of the boat from Boston on December 27, 1939, with the absentee on it, its destination (New York), his failure to land at New York, and then finally is set forth in specific language the drowning of the deceased "sometime between nine o'clock P.M. of December 27, 1939 and prior to the docking of said steamship *Acadia.*" This we deem sufficient.

*Exceptions in all cases overruled.*

STURGIS, C. J., and THAXTER, J., not participating.
MURCHIE, J., concurring in result only.