ALMON, Justice.
Bernice Eubanks, sister of Anne Jean Wilcox Dawson, filed a complaint in circuit court requesting the court to declare Anne Dawson dead; prior to the filing of the complaint in circuit court, the probate court appointed Eubanks as Administrator Ad Colligendum for the estate of Anne Dawson, pending proof of death. The circuit court found that Anne Dawson is dead and that her death occurred on or about September 24, 1974.
This appeal was taken by W. S. Pritch-ard, Jr., as guardian ad litem for the interest of Anne Dawson. Appellant contends (1) that the circuit court did not have jurisdiction of the case, (2) that Alabama law does not authorize declaring a missing person dead until at least seven years have passed (3) that a tape from a Federal Grand Jury proceeding was improperly considered by the judge, and (4) that the decision was contrary to the great weight of the evidence.
FACTS
Mrs. Dawson, age 49, was last seen by her sister, Cecelia Worley, on Sunday, September 22,1974, at Dawson’s cottage near Gun-tersville Lake. Mrs. Dawson’s plans were to leave Guntersville late Monday, September 23, 1974, and to return to her home in Birmingham, and to be at her business, a beauty shop in Fairfield, on the following Tuesday.
*388 Appellee Eubanks entered into evidence, without objection, a number of police reports. Part of the information contained therein is the following:
Tina Burgess, part owner of the C & S Lounge, stated to investigating officers that a woman identified as Anne Dawson came into the lounge at approximately 6:15 P.M. on Monday, September 23, 1974. A little later, Mrs. Burgess received a $50.00 bill and inquired if anyone in the place could change it. Mrs. Dawson did so and in the process removed a lot of money from her purse.
A man believed to be Paul John Knowles had come to the lounge shortly after 3:45 PM. When Mrs. Dawson changed the $50.00 bill, this man came up to her and began a conversation. Between then and approximately 9:15 PM when they left together, they appeared to have become quite friendly.
Peggy Pulley, an employee of C & S Lounge, stated that this man came in at 11:00 AM and left about 3:00 PM. She left work about 3:50 PM. About 7:30 PM that evening, Peggy returned and noted that the man and a woman identified as Mrs. Dawson were together.
Peggy Pulley and Mrs. Burgess described the man as age 30; approximately 6 feet tall; 170 pounds, red hair with no part which became below the ears; brown eyes with red streaks; gold, brown and white plaid shirt; gold pants; white belt; and white shoes with buckles.
A report later obtained by the police described Knowles as a white male, age 29, 6 feet 2 inches tall, 180 pounds. Knowles used the credit card of William Bates, whom Knowles is believed to have murdered in Homewood, Alabama, on September 23, 1974.
The following day, Tuesday, September 24, 1974, Mrs. Dawson’s car was found at the Hide-a-Way Lounge in Tarrant City, several miles south of the C & S Lounge. Diane Campbell of the Hide-a-Way Lounge observed a man approximately 40 years old, brownish-grey hair, dressed in a suit and tie come in around 8:00 or 8:15 PM on the 23rd of September. A woman who was possibly Mrs. Dawson came in about 8:30 PM. They left together about 9:00 PM.
Another waitress, Nancy Manning, had served the party drinks. She looked at a picture of Mrs. Dawson, but could not make positive identification. She described the man as 5 feet, 9 inches tall, grey haired, in his 40’s, and dressed in a suit and tie.
On October 9,1974, all three Birmingham area television stations and both newspapers were given a synopsis of the case, along with photographs of Mrs. Dawson and a reproduction of the composite of the suspect, for dispersion through the news media.
Around the middle of January, 1975, Sgt. Jeffrey Webb of the Birmingham Homicide Detail received information that Mrs. Dawson had been taken to Louisiana and murdered. The basis for the information was a memorandum of a tape made by Paul John Knowles. Accompanying the memorandum was a court order from U.S. District Judge Wilbur D. Owens, Jr., prohibiting dissemination of the information. Notes made from the memorandum read as follows:
“In an unknown town somewhere in Ala., probably the latter part of Sept., 1974, Knowles picked up a woman in a low-class bar. She was in her 40’s possibly 50’s and apparently was fairly attractive. Her first name was Ann. She was a beautician and owned a beauty shop. The two left the first bar and went to a nicer bar not far away. Following several drinks, they went to the parking lot of the bar at which point Knowles abducted her at knife point. Her car was apparently left in the parking lot. Thereafter Knowles transported the woman in his ‘73 Chev. Impala white bottom, blue vinyl top, to an area just inside Louisiana, off of 1-20 where he took her into the woods, raped her and strangled her. He obtained about $500 from her. The wooded area is not far from a town, name unknown.”
Sgt. Webb and others during the middle of January, 1975, made an extensive search *389 of a large area in Madison Parish, Louisiana. The search included use of horses, 4 wheel drive vehicles and a helicopter. A significant portion of the area was under water, which would not have been the case in September. The search failed to find the body.
In the middle of February, 1975, Sgt. Webb went to a site near Bovina, Mississippi, where two skeletons had been found near a small creek. Part of the bones had been washed away. Based on the dental chart of Mrs. Dawson, a pathologist at Vicksburg General Hospital established that neither body was that of Anne Dawson.
Paul John Knowles’ lawyer was contacted by the news media of Vicksburg, Mississippi. He stated to them that in addition to Knowles’ admitted killing of a beautician nearby, he also killed a teenage girl about the same time in the same area. The pathologist had established that one of the skulls found was definitely that of a teenager.
While the testimony of Sgt. Jeffrey Webb was being taken, the trial judge interjected the following:
“THE COURT: It might be proper at this time for the Court to state that it now has before it, and has had before it for the past several days, a transcript of the Federal grand jury proceedings conducted on January the 7th, 1975, in Macon, Georgia, relative to Paul John Knowles and which is a transcript of certain tapes which were found in his possession. The information relative to Anne Jean Wilcox Dawson is contained in the material in the transcript which consists of about 62 pages which was a recitation of the events in the life of this person, Knowles. The Court has carefully read and considered all of this matter in the transcript. The transcript has been submitted to this Court under seal and is to be returned under seal. And, this Court and this Court alone has looked at it and it alone will look at it as set forth in the forwarded letter from the Federal Judge in Macon, Georgia, from whose office it was received. The information in this transcript can be tied in with the information which has been given from several witnesses and particularly from Sergeant Webb who is testifying presently that makes the Court familiar with statements that he has made and makes his statements coherent and cognizant to the Court and makes it improper [sic] evidence. All right. Let’s proceed.”
Sgt. Webb’s conclusion was that Mrs. Anne Dawson was murdered by Paul John Knowles.
Mrs. Dawson was not married at the time of her alleged death, though she had been married three times. She divorced her first husband, Miller, and her second husband, Dawson, and apparently annulled her third marriage with Wolfe. Her three minor grandchildren, her sole heirs, were the result of a child by her first husband, Miller. A guardian ad litem was appointed by the trial court to represent the grandchildren; they are before us as appellees.
Mrs. Dawson had undergone surgery and her kidneys were failing. She had a colostomy requiring daily care, and regularly took antibiotics. Her sister, Cecilia Worley, testified that Mrs. Dawson did not take her extra sterilized bag or her antibiotics with her. Worley’s testimony indicated Mrs. Dawson “didn’t have very much longer to live . . . .” However, Mrs. Dawson does not appear to have been despondent about life. On the contrary, Worley testified she “was beginning to get her head above water [financially],” and looked forward to when she could spend all of her time at the house on Guntersville Lake.
As far as Mrs. Dawson’s business, her sisters and an employee testified she was very dependable. If she was going to miss a day for some reason, she would always let them know. Tuesdays were days when only Mrs. Dawson and one other beautician worked. Mrs. Dawson was always careful not to allow one beautician to be there alone, and she always handled her own customers. Moreover, she always communicated with her sister, Eubanks, as many as three times a week.
*390 Should Mrs. Dawson be declared dead, her estate would pass to her three minor grandchildren, ages 16, 17 and 18 as of March, 1976. The appellee, Eubanks, and Dawson’s other sister, Worley, would get nothing.
I
Appellant contends that the circuit court did not have jurisdiction of this case. He argues that jurisdiction properly lies with the probate court under Tit. 61, § 156 et seq., Code of Alabama, 1940, Recompiled 1958. Tit. 61, § 156, reads as follows:
“§ 156. Appointment of administrators. — It shall be lawful for the respective probate courts of this state to appoint administrators of the estates of persons who are presumed to be dead on account of absence for seven or more years from the place of their last domicile within this state as in this article provided.”
Appellees contend that what they are seeking is a declaratory judgment as prescribed by Rule 57 of the Alabama Rules of Civil Procedure and Tit. 7, §§ 156-168, Code, supra.
Tit. 7, § 159, reads as follows:
“§ 159. Who may have deciaration of rights, etc. — Any person interested as or through an executor, administrator, trustee, guardian, or other fiduciary, creditor, devisee, legatee, heir, next of kin, or ces-tui que trust, in the administration of a trust, or of the estate of a decedent, an infant, lunatic, or insolvent, may have a declaration rights or legal relations in respect thereto: To ascertain any class of creditors, devisees, legatees, heirs, next of kin, or other; or to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity; or to determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.”
Rule 57, in addition to referring to Tit. 7, §§ 156-168, notes that “[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.” In addition, Rule 2, ARCP, states that “[there shall be one form of action to be known as ‘civil action.’ ”
We see no problem with the jurisdiction of the court. The probate court appointed her administratrix ad colligendum pending proof of death. While the probate court could have made that decision, or alternatively, the estate could have been transferred to the circuit court via Tit. 13, § 139, Code, supra, Rule 57 clearly provides that the existence of another remedy does not make a declaratory judgment inappropriate.
Appellant contends that the relief requested is not equitable relief. The question of whether the relief requested is equitable or legal is now academic in that either type of relief may be granted by the same court. Rule 2, ARCP.
Appellant also argues that the court lacked jurisdiction because appellee Eu-banks has no interest in the controversy, i.e., she lacks standing. Eubanks was appointed administratrix ad colligendum pending proof of death by the probate court. She was the next of kin capable of serving as the grandchildren were then minors. See Tit. 61, § 81, Code, supra. Tit. 7, § 159, Code, supra, specifically addresses this contention.
II
Neither the research by the parties to this case nor that by us has disclosed an Alabama case addressing the question of declaring a missing person dead where they have been missing for less than 7 years. Appellant thus argues that to do so is contrary to Alabama law.
According to Corpus Juris Secundum a person missing less than 7 years may be proven dead.
. . Where a person has disappeared it is not always necessary to wait for seven years before attempting to prove that he is dead; death may be proved by showing facts from which a *391 reasonable inference would lead to that conclusion.
“The fact of death may be proved by direct evidence, or it may be proved in some instances by circumstantial evidence alone. If the fact of death is proved by evidence and inferences therefrom, no presumption as to death, common law or statutory, need be brought into play.” 25A C.J.S. Death § 9.
An earlier work, Greenleaf on Evidence, provides the following on the subject:
“Other presumptions are founded on the experienced continuance or permanency of longer and shorter duration, in human affairs. When, therefore, the existence of a person, a personal relation, or a state of things, is once established by proof, the law presumes that the person, relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised, from the nature of the subject in question. Thus, where the issue is upon the life or death of a person, once shown to have been living, the burden of proof lies upon the party who asserts the death. But after the lapse of seven years, without intelligence concerning the person, the presumption of life ceases, and the burden of proof is devolved on the other party. This period was inserted, upon great deliberation, in the statute of bigamy, and the statute concerning leases for lives, and has since been adopted, from analogy, in other cases. . . . Upon an issue of the life or death of a party, . the jury may find the fact of death from the lapse of a shorter period than seven years, if other circumstances concur; as, if the party sailed on a voyage which should long since have been accomplished, and the vessel has not been heard from. . . .”1 Greenleaf on Evidence, § 41 (14th edition, 1883).
In a footnote from the above quotation is found the following:
“But in accordance with the English authorities and the better rule, it was held that there is no presumption as to the date of his death within the seven years . . ..” Id., fn. (b) at 58.
Our case law has followed the common law rule that a party who has not been heard from for 7 years is presumed dead, as well as the rule that the party’s death may be proved to have occurred within the 7 years, though otherwise he is assumed to have died at the end of the 7 years. See Kyser v. McGlinn, 207 Ala. 82, 92 So. 13 (1921); Walker v. Walker, 218 Ala. 16, 117 So. 472 (1928); Eisenberg v. Stein, 222 Ala. 576, 133 So. 281 (1931); 7A Ala.Dig., Death, <s=»2.
The difference between proving a person dead who has been missing less than 7 years rather than more than 7 years lies in the degree of proof required to establish the death. In the latter case there is a presumption of death which shifts the burden of proof to the party claiming life, though even here the presumption has to be applied with care. See National Life & Accident Ins. Co. v. Ruffin, 237 Ala. 401, 187 So. 488 (1939). In the former case, the party claiming death must carry the full burden of proving death, including overcoming the presumption of life.
Logically, we see no reason why a missing person cannot be proved dead in less than 7 years. Other states, as well as the United States Supreme Court, have reached the same conclusion. See Fidelity Mutual Life Association v. Mettler, 185 U.S. 308, 22 S.Ct. 662, 46 L.Ed. 922 (1902); Tisdale v. Connecticut Mutual Life Insurance Co., 26 Iowa (Stiles) 170 (1868); Cox v. Ellsworth, 18 Neb. 664, 26 N.W. 460 (1886); Bernstein v. Metropolitan Life Ins. Co., 139 Me. 388, 34 A.2d 682 (1943).
“ . . .By reference to the textbooks and cases, it seems to be the settled rule, both in England and this country, that seven years is the period at which the presumption of continued life ceases; but this period may be shortened by the proof of such facts and circumstances connected with the person whose life is the subject of inquiry, as, when submitted to the test of reason and experience, would force the conviction of death *392 within a shorter period. Under the rule above stated, if any person domiciled in the city of Lincoln leaves the place of his residence on a journey of business, health, or pleasure, or simply disappears, and does not return, nor is heard of by any person at said city, or elsewhere, so far as is known to the authority making the inquiry, until the lapse of the period of seven years, the presumption that the person is still in life ceases to exist, and he is presumed to be dead, without regard to any fact connected with the circumstances, life, or habits of such person. But when the inquiry arises before the expiration of seven years, and the facts and circumstances of the person are proved to have been such as to compel the thoughtful and experienced mind to believe that, if still living, such absent person would have returned, or communicated with his home, wife, children, relatives, or friends left behind, or to the care and enjoyment of property abandoned, and that he has never returned, — in such case, although the period of seven years has not elapsed, the presumption of continued life may be held to have ceased.” Cox v. Ellsworth, supra, 18 Neb. at 669, 26 N.W. at 462.
Our legislature has adopted the common law of England (Tit. 1, § 3, Code, supra) which appears to have allowed proof of death in less than 7 years. 1 Greenleaf on Evidence, § 41, fn. 1 at 59 (14th ed. 1883).'
We conclude, therefore, that upon proper proof, a person missing less than 7 years may be proven dead.
Ill
Appellant contends that it was clearly improper for the trial judge to consider the transcript of the Federal Grand Jury proceedings, where the transcript was not placed into evidence. In rebuttal, appellees note that appellant made no objection, nor did he move for the judge to exclude that information from his consideration. Rule 43(c) ARCP.
While we are of the opinion that the transcript of the Federal Grand Jury was, under the circumstances, properly before the court, we shall nevertheless proceed to review the sufficiency of the evidence as it appears in the record.
IV
Appellant’s argument that Appellee Eubanks failed to prove the death of Mrs. Anne Dawson is perhaps most strongly stated in the points he made during his cross-examination of Sgt. Webb: (1) No one positively identified Knowles as being with Mrs. Dawson on September 23, though Sgt. Webb felt assured that things “matched” when he received information in January from the U.S. District Court in Macon, Georgia. (2) The only conclusive evidence was the confession by Knowles. Appellant notes that Knowles could not be convicted for murdering Mrs. Dawson based on his confession without independent evidence of corpus delicti.
However, the question is not whether the evidence will support a criminal conviction of Paul John Knowles. The question is whether Mrs. Dawson has been proven dead by a preponderance of the evidence.
“ . . . This was not a criminal case, and it was not necessary that the death should be proven beyond a reasonable doubt. The party on whose side the weight of evidence preponderated was entitled to the verdict. . . . ” Fidelity Mutual Life Association v. Mettler, supra, 185 U.S. at 317, 22 S.Ct. at 665-666.
In summary, the evidence presented earlier shows the following:
1. Mrs. Dawson was dependable in the operation of her business.
2. She had a good relationship with her sisters.
3. She had health problems requiring daily care.
4. Her health problems would eventually terminate her life prematurely.
5. She looked forward to a time in the near future when she could spend all of her time at her house near Guntersville Lake.
*393 6. A diligent search was made to find Mrs. Dawson.
7. No one has heard from her since September 23, 1974.
8. The night before her disappearance, she was seen in the C & S Lounge with a man fitting Knowles’ description.
9. Knowles used Bates’ credit card in Homewood, Alabama, on September 23, 1974.
10. Knowles confessed to murdering a beautician named Ann who he met in a low class bar.
Based on the above, we conclude that Appellee Eubanks has rebutted the presumption of life and proved by a preponderance of the evidence that Mrs. Anne Jean Wilcox Dawson is dead. However, we add the caveat that judges should be on guard against abuse of attempts to declare persons dead in less than 7 years. Convincing evidence should be required to overcome the presumption of life.
The judgment of the trial court is affirmed.
AFFIRMED.
BLOODWORTH, JONES and EMBRY, JJ., and SIMMONS, Retired Circuit Judge, sitting by designation of the Chief Justice, concur.